# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **BRANDON A. BACKE, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| **v.** | § | **CIV. NO. 10-CV-388** |
| | § | |
| **CITY OF GALVESTON, TEXAS, et al.** | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM AND ORDER

Pending before the Court is the Motion for Summary Judgment filed on behalf of some, but not all, of the officer defendants sued in this case for alleged use of excessive force (the "Individual Defendants" and, with Defendant City of Galveston, "Defendants").[1] (Doc. No. 111). After considering the Motion, all responses thereto, and the applicable law, the Court finds that the Individuals Defendants' Motion for Summary Judgment (Doc. No. 111) must be **GRANTED IN PART** and **DENIED IN PART**.

## I.    FACTUAL BACKGROUND

On October 4, 2008—three weeks after Hurricane Ike hit the island—Plaintiffs (excluding Plaintiff Charles Young) attended a wedding at the Galveston Island Convention Center. Following the reception, which ended around 11 p.m., many guests went to the adjacent San Luis Resort and congregated at H2o, the hotel's bar.

Officer Chris Sanderson—a member of the Galveston Police Department—was working security at H2o that night. Another security officer employed by the hotel, Carlos Gonzales, directed Officer Sanderson's attention to Plaintiff Daniel "Cole" O'Balle, the bride's 19-year-old

---

[1] A motion for summary judgment has also been filed on behalf of Defendant City of Galveston, Texas. (Doc. No. 112.) The Court will address this motion by separate order.

brother, who had just entered the bar.[2] Officer Sanderson and Mr. Gonzales approached Cole and physically escorted him to the northeast side of the bar, near the bar's restrooms. Other bar patrons approached, including at least one individual who physically interceded between Cole and the two security guards. Officer Sanderson decided to place Cole under arrest, and radioed for assistance. (Doc. No. 112-12, at 11, 18.)

In the ensuing thirteen minutes, over twenty Galveston Police Department officers arrived on the scene to assist with Cole's arrest and to conduct crowd control. (Doc. No. 112-12, at 10-12.) The H2o bar was evacuated, and at least twelve individuals were arrested. Most were charged with various Class B and Class C misdemeanors. (Doc. No. 112-12, at 7.) According to Plaintiffs, many of the reporting officers deployed force—including oleoresin capsicum spray ("O.C. spray" or "pepper spray"), tasers, baton strikes, kicks, closed hand strikes, and other types of force—against individuals who were attempting to comply with their instructions. Twelve of these individuals have brought claims under Section 1983 for violation of their Fourth Amendment rights to be free of unreasonable seizure. (Doc. No. 106 ("3rd Am. Compl."), at ¶¶ 65-74.) Thirteen Galveston Police Department officers are named as defendants in their individual capacities. (*Id*. at ¶¶ 15-27.)

## II.    LEGAL STANDARDS

A motion for summary judgment requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. FED. R.

---

[2] Numerous reasons are given for Mr. Gonzales's decision to alert Officer Sanderson to Cole, including that Cole had been belligerent with Mr. Gonzales while at the wedding reception in the adjacent convention center; that Cole appeared to be intoxicated despite being underage; and that Cole had carried an alcoholic beverage from the wedding reception to the H2o bar. (Doc. No. 112-12, at 15; Doc. No. 112-14, at 10.) Officer Sanderson testified that he approached Cole because he was going to remove him from the bar at Mr. Gonzales's direction—due to problems Cole caused at the convention center—and because Cole was in possession of an illegal beverage. (Doc. No. 113-3, at 72-73.)

CIV. P. 56(a). "Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Kee v. City of Rowlett, Tex.*, 247 F.3d 206, 210 (5th Cir. 2001) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "A fact is material if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation marks and citation omitted).

"Facts and inferences reasonably drawn from those facts should be taken in the light most favorable to the non-moving party." *Nichols v. Enterasys Networks, Inc.*, 495 F.3d 185, 188 (5th Cir. 2007). The Court may not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* at 151 (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, p. 300 (2d ed. 1995)). Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. FED. R. CIV. P. 56(e)(1); *see, e.g.*, *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (noting that a nonmovant's burden is "not satisfied with 'some metaphysical doubt as to the material facts'") (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

### III. ANALYSIS

#### A. The Individual Defendants invoke qualified immunity to Plaintiffs' claims of excessive force.

The Individual Defendants seek summary judgment on the basis of qualified immunity. (Doc. No. 111 ("Mot."), at 1.) Analysis of a qualified immunity defense proceeds in two stages. The first stage addresses whether a plaintiff was subjected to a constitutional deprivation—here, to the use of excessive force. *See Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009). The second stage addresses whether the constitutional deprivation was objectively unreasonable under prevailing law at the time of the incident. *See id.* If a reasonable police officer in the specific circumstances faced by the defendant would not have known that his conduct was unlawful under clearly established law, qualified immunity protects the defendant from liability. *See Saucier v. Katz*, 533 U.S. 194, 201-02 (2001).

As with any argument raised on summary judgment, the Court must decide whether the Individual Defendants are entitled to qualified immunity under the facts alleged and substantiated by Plaintiffs, with all reasonable inferences from those facts drawn in the Plaintiffs' favor. *See Saucier*, 533 U.S. at 201. In other words, if the resolution of a genuine issue of fact would alter whether a defendant is entitled to qualified immunity, the Court may not decide the issue on summary judgment; the material fact must be submitted to and decided by a jury. *See Bazan ex rel. Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 490 (5th Cir. 2001) (acknowledging that qualified immunity cannot be decided on summary judgment "if there are *genuine issues of material fact*") (emphasis original); *see also Minter v. Great Am. Ins. Co. of New York*, 423 F.3d 460, 465 (5th Cir. 2005) ("A fact-issue is material only if its resolution could affect the action's outcome.").

4

1. **The first stage of qualified immunity: whether a constitutional deprivation occurred**

"To succeed on an excessive force claim, a plaintiff bears the burden of showing '(1) an injury (2) which resulted directly and only from the use of force that was excessive to the need and (3) the force used was objectively unreasonable.'" *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001) (quoting *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000)). Although the injury need no longer be "significant" to support an excessive force claim, an injury that is merely de minimis will not suffice. *See id.*

It is axiomatic that a police officer, in the commission of an investigatory stop or arrest, has authority to employ some force or threat of force to achieve compliance from a subject. *See Graham v. Connor*, 490 U.S. 386, 396 (1989). "'Not every push or shove'" undertaken by a police officer in the field "violates the Fourth Amendment," even if it "'later seem[s] unnecessary in the peace of a judge's chambers.'" *See id.* (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). The Supreme Court, in *Graham v. Connor*, established three guideposts for the determination of whether a particular use of force was "excessive to the need." These guideposts—often referred to as the *Graham* factors—are: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to police officers or civilians; and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by fleeing the scene. *See id.* The *Graham* factors remain the guiding framework for judging whether an officer's use of force was excessive to the need. *See, e.g., Ramirez v. Martinez*, 716 F.3d 369, 378 (5th Cir. 2013); *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009).

The factual circumstances which may give rise to an excessive force claim are virtually limitless. *See Saucier*, 533 U.S. at 205. Consequently, the objective reasonableness of a particular use of force is highly fact- and context-specific. *See Tarver v. City of Edna*, 410 F.3d

745, 753 (5th Cir. 2005) ("To determine the objective reasonableness of an officer's use of force, 'we pay careful attention to the facts and circumstances of each particular case[.]'") (quoting *Gutierrez v. City of San Antonio*, 139 F.3d 441, 447 (5th Cir. 1998)). It must be judged in light of the information available to the officer at the time. *See Graham*, 490 U.S. at 397; *see also Anderson v. Creighton*, 483 U.S. 635, 641 (1987) (noting that the "relevant question" in qualified immunity is whether a "reasonable officer" could have believed defendant's actions to be lawful "in light of clearly established law *and the information the [defendant] possessed*") (emphasis added). Some amount of deference is afforded to the officer's discretion, as his or her service in real time, in unknown environs, often requires split-second decisions based on evolving information. *See Brown v. Glossip*, 878 F.2d 871, 873 (5th Cir. 1989); *see also Gilles v. Davis*, 427 F.3d 197, 207 (3d Cir. 2005). Importantly, "[t]he 'reasonableness' of a particular use of force" cannot be judged "with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396.

At the same time, the standard is an objective one—whether the use of force was "'objectively reasonable' in light of the facts and circumstances confronting [the officer]" at the time force was employed. *See Graham*, 490 U.S. at 397. In such an analysis, the subjective intent of the defendant in question plays no meaningful role. *See Poole v. City of Shreveport*, 691 F.3d 624, 630 (5th Cir. 2012) ("Officers' subjective intent is irrelevant [to qualified immunity].").
"An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Graham*, 491 U.S. at 397.

**2.**     **The second stage of qualified immunity: whether the constitutional deprivation was objectively unreasonable**

The second stage of the qualified immunity analysis focuses on whether the alleged constitutional deprivation was objectively unreasonable under clearly established law. This prong is comprised of two separate, but related, inquiries: "whether the allegedly violated constitutional rights were *clearly established at the time of the incident*; and, if so, whether the defendant's conduct was *objectively reasonable* in the light of that then clearly established law." *Tolan v. Cotton*, 713 F.3d 299, 305 (5th Cir. 2013) (quotation marks and citation omitted).

A right is clearly established when "*every* 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, ––– U.S. ––––, 131 S.Ct. 2074, 2083 (2011) (emphasis added) (quoting *Anderson*, 483 U.S. at 640). "Existing precedent must place the statutory or constitutional question beyond debate." *Tolan*, 713 at 306 (quotation marks and citation omitted); *see also Saucier*, 533 U.S. at 206 ("Qualified immunity operates to protect officers from the sometimes 'hazy border between excessive and acceptable force[.]'") (quoting *Priester v. Riviera Beach*, 208 F.3d 919, 926-27 (11th Cir. 2000)). Requiring an alleged constitutional deprivation to violate clearly established law before relief may be pursued "balances the vindication of constitutional or statutory rights and the effective performance of governmental duties by ensuring officials can 'reasonably . . . anticipate when their conduct may give rise to liability for damages.'" *Id.* (quoting *Davis v. Scherer*, 468 U.S. 183, 195 (1984)).

**B.**     **Because genuine issues of material fact exist, the Court cannot decide qualified immunity on summary judgment for a number of the Individual Defendants.**

The Court has reviewed extensive documentation of the events of the night of October 4, 2008—including police reports, investigative summaries, deposition testimony, and video taken at the scene. The encounters between Plaintiffs and the Individual Defendants occurred in

multiple public spaces in and around the San Luis property. As is to be expected with so many witnesses, and so much simultaneous activity, it is impossible to distill a single, undisputed narrative of what took place that night. Indeed, in most cases, Plaintiffs' version of the facts and Defendants' version of the facts bear little to no resemblance to each other.[3] It is clear that, in any future trial of this case, "questions about the credibility of key witnesses [will] loom large." *See Deville*, 567 F.3d at 165 (quotation marks and citation omitted).

The factual descriptions below are pieced together from the summary judgment record. Where material facts are genuinely disputed—that is, where they are supported by credible evidence—the Court has used the facts most supportive of Plaintiffs' claims. All reasonable inferences have been drawn in Plaintiffs' favor.

### 1. The claims of Cole O'Balle and the Belluominis

Officers Chris Sanderson and Clemente Garcia seek summary judgment on the claims asserted by Plaintiffs Joseph and Shannon Belluomini.[4] (Mot. at 7-8.) Officer Jonathan Longoria seeks summary judgment on the claim asserted by Plaintiff Cole O'Balle. (Mot. at 9.)

### a. Factual background

As described above, Officer Sanderson and another security officer employed by the San Luis Resort, Mr. Gonzales, escorted Cole O'Balle to the back of the H2o bar. (Doc. No. 112-12, at 16.) As they were walking, Cole asked what he had done and received no response. (Doc. No.

---

[3] More troubling than this incongruence between Plaintiffs' and Defendants' versions of the facts—an expected occurrence in any litigation—is the frequent incongruence within the Individual Defendants' own accounts. For many of the Individual Defendants, his or her description of the events of October 4-5, 2008 changed significantly over the course of the City of Galveston's investigation into the H2o incident.

[4] Officers Sanderson and Garcia are also alleged to have employed excessive force against Plaintiff Cole O'Balle. (Doc. No. 106 ("3rd Am. Compl."), at ¶ 37.) Summary judgment is not sought on Cole O'Balle's claims against Officers Sanderson and Garcia.

113-9, at 43.) The three men stopped near the restroom area, where Officer Sanderson pushed Cole against a wall. (Doc. No. 113-16, at 100, 104.) Much of the relevant activity in this case occurred at this location. For simplicity, the Court will refer to it as "Cole's Arrest Site."

Mr. Belluomini, Mrs. Belluomini, and Michael Patterson—who had noticed Cole being escorted through the bar by Officer Sanderson and Mr. Gonzales—arrived at Cole's Arrest Site shortly thereafter. (Doc. No. 113-12, at 44; Doc. No. 113-16, at 113.) Mrs. Belluomini began talking to Mr. Gonzales. (Doc. No. 113-12, at 44; Doc. No. 113-13, at 50.) She asked Mr. Gonzales why he was at the H2o bar, since Cole had complied with his earlier instruction to leave the convention center where the wedding had taken place. Mr. Gonzales replied that Cole had not gone far enough. (Doc. No. 113-12, at 44; Doc. No. 113-13, at 52.) Mr. Gonzales also said that he was going to have Cole arrested. (Doc. No. 113-13, at 50.) Mrs. Belluomini pleaded with Mr. Gonzales and Officer Sanderson for them to let her take Cole up to his hotel room. (Doc. No. 112-17, at 27.)

As Mrs. Belluomini spoke with Mr. Gonzales, Mr. Belluomini continued on to where Cole was standing and stood in front of him. (Doc. No. 113-12, at 44; Doc. No. 113-13, at 54-55.) Cole's back was to the wall, and Mr. Belluomini placed his hands against the wall on either side of Cole such that Cole was between his arms. (Doc. No. 113-12, at 44; Doc. No. 112-17, at 26; Doc. No. 113-20, at 12; Doc. No. 112-17, at 29.) Mr. Belluomini admits that this posture put him in between Cole and Officer Sanderson, but claims he was simply trying to calm Cole down because Cole seemed scared. (Doc. No. 112-17, at 20; Doc. No. 113-12, at 50-52.) Mr. Belluomini denies that he was holding Cole back. (Doc. No. 113-12, at 55-56; Doc. No. 113-16, at 117.)

As Mr. Belluomini was between Officer Sanderson and Cole, he sometimes faced Cole and sometimes faced Officer Sanderson. (Doc. No. 112-17, at 25; Doc. No. 113-3, at 111-12.) He asked Cole what was happening; Cole responded that he didn't know. (Doc. No. 113-12, at 44-45.) Mr. Belluomini tried to reassure Cole that everything would be ok. (*Id.*; Doc. No. 113-13, at 55-56; Doc. No. 113-20, at 12.) Mr. Belluomini also asked Officer Sanderson what was going on and what Cole did wrong. (Doc. No. 113-16, at 108-09.) Cole and Mr. Patterson asked Officer Sanderson similar questions. (*Id.*; Doc. No. 113-20, at 10.) Cole had his hands in the air as he was asking. (Doc. No. 113-16, at 132.) Officer Sanderson did not respond to these questions. (*Id.* at 103, 110.) Mr. Belluomini assured Officer Sanderson that he was a friend of the family, and that the family would take care of whatever situation had occurred. (Doc. No. 113-20, at 11; Doc. No. 112-17, at 29.)

Approximately one minute after arriving in the restroom area, Officer Sanderson withdrew his baton. (Doc. No. 113-13, at 57; Doc. No. 113-16, at 110-11.) Mrs. Belluomini begged for everyone to remain calm. (Doc. No. 113-13, at 64.) She then noticed another police officer—Officer Clemente Garcia—approaching.[5] (*Id.* at 68.) Officer Garcia rushed past Mrs. Belluomini and punched Cole on the left side of his head. (*Id.* at 68-69; Doc. No. 112-17, at 25; Doc. No. 113-16, at 118; Doc. No. 112-17, at 23.) At the same time, Mr. Gonzales placed Mr. Belluomini in a chokehold. (Doc. No. 113-12, at 45; Doc. No. 112-12, at 18.) As Mr. Belluomini was in the chokehold, he was pepper sprayed by Officer Sanderson and lost consciousness.[6] (*Id.*)

---

[5] Although apparently unnoticed by Cole, Mr. Belluomini, and Mrs. Belluomini, Officer Sanderson had radioed for assistance from fellow officers at some point during his brief encounter with Cole.

[6] Although Mr. Belluomini did not see who sprayed him (Doc. No. 112-17, at 59), Officer Sanderson admits to deploying O.C. spray on Mr. Belluomini. (Doc. No. 112-13, at 35.) This is confirmed by eyewitnesses to the encounter. (Doc. No. 112-17, at 27.)

After Officer Garcia punched him, Cole stumbled to his right, and Officer Sanderson charged at him. (Doc. No. 113-16, at 121-22.) Cole was punched repeatedly by Officer Garcia and hit repeatedly by Officer Sanderson with his baton. (*Id*. at 121-22, 128; Doc. No. 112-17, at 25; Doc. No. 112-18, at 14, 29; Doc. No. 112-13, at 35, 42; Doc. No. 112-20, at 61-62.) Several witnesses saw Officer Sanderson deliver baton strikes to Cole's head. (Doc. No. 113-9, at 53; Doc. No. 113-20, at 16; Doc. No. 112-17, at 25.) Cole tried to protect himself from the blows, but he did not fight back. (Doc. No. 113-16, at 132; Doc. No. 113-9, at 62-63.) A third officer, Jonathan Longoria—who had arrived with Officer Garcia—then tased Cole in his abdomen. (Doc. No. 112-13, at 44; Doc. No. 112-20, at 32; Doc. No. 113-9, at 62.) Cole fell to the ground. (Doc. No. 113-9, at 64.) Officer Garcia and Officer Sanderson continued to strike Cole after he had gone to the ground; they also kicked him and stomped on him, including on his head. (*Id*.; Doc. No. 113-20, at 15; Doc. No. 112-16, at 8.) Once again, Cole did not fight back. (Doc. No. 113-20, at 16.)

Mrs. Belluomini screamed for the officers to stop. (Doc. No. 113-20, at 16.) She threw herself on Cole's head to protect him from the blows. (Doc. No. 112-17, at 29, 31; Doc. No. 113-20, at 15, 17; Doc. No. 117-19, at 19-20.) One of the officers removed her from Cole by her hair (Doc. No. 117-19, at 20), and Officer Sanderson pepper sprayed her in the face.[7] (Doc. No. 113-20, at 17; Doc. No. 113-12, at 62, 66; Doc. No. 117-19, at 20.)

---

[7] Although multiple eyewitnesses observed Mrs. Belluomini being pepper sprayed, none identifies the officer responsible. (Doc. No. 113-12, at 62, 66; Doc. No. 112-17, at 32; Doc. No. 113-9, at 53-55; Doc. No. 113-20, at 16.) However, Officer Sanderson admits to deploying O.C. spray on Mrs. Belluomini. (Doc. No. 112-13, at 35; Doc. No. 113-4, at 59.)

**b.      Mr. Belluomini's claim against Officer Sanderson**

Mr. Belluomini claims that Officer Sanderson used excessive force when he deployed O.C. spray at Mr. Belluomini while he was in a chokehold by Mr. Gonzales. (Doc. No. 113-5, at 18.) Defendants argue that Officer Sanderson is entitled to qualified immunity on this claim because he "appropriately applied the use of force continuum" when he used command presence, then oral warnings, and then O.C. spray to obtain Mr. Belluomini's compliance with an order to move away from the arrest site. (Mot. at 10-11.) All of these factual contentions, however, are disputed by Mr. Belluomini and other eyewitnesses. Under the version of events advanced by Plaintiffs, Mr. Belluomini was never asked to move away from Cole, by Officer Sanderson or anyone else. Instead, Officer Garcia and Officer Sanderson began physically assaulting Cole without any warning whatsoever. Officer Sanderson's deployment of O.C. spray against Mr. Belluomini was likewise unannounced, affording Mr. Belluomini no opportunity to comply with any command—even if compliance was possible, given that Mr. Belluomini had been immobilized by Mr. Gonzales's headlock. Clearly, if the above factual disputes are resolved in Mr. Belluomini's favor, a jury would be entitled to find Officer Sanderson's decision to deploy O.C. spray against Mr. Belluomini to be excessive and objectively unreasonable under the circumstances.

Additionally, if the jury credits the facts as advocated by Plaintiffs, Officer Sanderson would not be entitled to the safe harbor presented by qualified immunity. At the time of the incident, it was clearly established that the use of pepper spray against a non-resistant subject is unconstitutional. *See Golden v. Austin Cnty. Sheriff's Dep't*, Civil Action No. H-09-817, 2010 WL 3909476, at *7 (S.D. Tex. Sept. 30, 2010) (collecting cases, all of which pre-date 2008). Additionally, under Plaintiffs' version of events, none of the *Graham* factors supported the use

of force against Mr. Belluomini. Thus, no reasonable officer in Officer Sanderson's position would have believed it lawful to deploy O.C. spray against Mr. Belluomini. *See Autin v. City of Baytown*, 174 Fed. App'x 183, 186 (5th Cir. 2005) (finding officer not entitled to qualified immunity on summary judgment when, on plaintiff's version of the facts, none of the *Graham* factors supports the officer's conduct); *see also Newman v. Guedry*, 703 F.3d 757, 763-64 (5th Cir. 2012) (noting that " in an obvious case' the *Graham* excessive-force factors themselves 'can clearly establish" whether a use of force is lawful) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)).

### c.  Cole O'Balle's claim against Officer Longoria

Cole claims that Officer Longoria used excessive force when he tased Cole. (Doc. No. 113-8, at 11.) Officer Longoria argues that it was objectively reasonable to tase Cole because he "observed Cole O'Balle, Officer Sanderson, and [Officer] Garcia in a physical altercation that included punches and produced blood." (Mot. at 9.) But Officer Longoria's position is only viable if the factfinder accepts the version of events advocated by Defendants—that Cole was actively fighting Officer Sanderson and Officer Garcia when he was tased. The version of events advocated by Plaintiffs, and adequately supported by the summary judgment record, is that Cole was passively receiving a beating from Officer Sanderson and Officer Garcia when Officer Longoria tased him. This fact issue prevents summary judgment on the first prong of qualified immunity.

The fact issue is also material to the second prong. At the time of the incident, it was well established that "the permissible degree of force [to be used during an arrest] depends on the severity of the crime at issue, whether the suspect posed a threat to the officer's safety, and whether the suspect was resisting arrest or attempting to flee." *Bush v. Strain*, 513 F.3d 492, 502

(5th Cir. 2008). If the factfinder accepts that Cole was not assaulting Officer Sanderson or Officer Garcia, despite being hit with a baton and punched by them, then none of the *Graham* factors supports Officer Longoria's decision to deploy his taser. Because no reasonable officer in Officer Longoria's position would think it lawful under clearly established law to use a taser on a passive and wounded suspect who is being physically dominated by fellow officers, Officer Longoria is not entitled to summary judgment on the basis of qualified immunity. *See Autin*, 174 Fed. App'x at 186; *see also Newman*, 703 Fed App'x at 763-64.

> ### d. Mrs. Belluomini's claims against Officer Sanderson and Officer Garcia

Mrs. Belluomini claims that either Officer Sanderson or Officer Garcia used excessive force when he lifted Mrs. Belluomini off Cole by her hair. (Doc. No. 113-5, at 29.) Additionally, she claims that Officer Sanderson used excessive force when he deployed O.C. spray at her. (*Id.*)

Although Defendants do not focus on Mrs. Belluomini's hair-pulling claim in their Motion, the summary judgment record reveals no genuine issue of fact to be tried to a jury. Mrs. Belluomini has never been able to identify whether it was Officer Sanderson or Officer Garcia who allegedly removed her from Cole by her hair during the melee. No eyewitness testimony helps to resolve the confusion, and neither Officer Sanderson nor Officer Garcia has admitted to physically handling Mrs. Belluomini. Without *any* evidence to determine which defendant is responsible for the commission of this alleged act of force, summary judgment is required. The jury simply has no evidentiary basis to find either Officer Sanderson or Officer Garcia liable for Mrs. Belluomini's injury. *See McNeil v. City of Easton*, 694 F. Supp. 2d 375, 395 (E.D. Pa. 2010); *cf Pershell v. Cook*, 430 Fed. App'x 410, 416 (6th Cir. 2011) (affirming denial of summary judgment when circumstantial evidence in the record "will provide the jury with

sufficient information to determine the liability of each individual defendant for the alleged constitutional violation").

Plaintiffs suggest that the exact identity of which officer grabbed Mrs. Belluomini by her hair is immaterial, because the officer who failed to intercede would be liable as a bystander. (Doc. No. 117 ("Opp."), at 19 n.2.) Plaintiffs are correct that "an officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983." *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995). However, this "bystander" liability obtains only if the bystander defendant had reasonable opportunity to intercede and prevent the constitutional violation. *See Spencer v. Rau*, 542 F. Supp. 2d 583, 594 (W.D. Tex. 2007) (relying upon *Davis v. Rennie*, 264 F.3d 86, 97-98 (1st Cir. 2001)). Even under the version of the facts advocated by Plaintiffs, Mrs. Belluomini was picked up by her hair and tossed to the side during the course of a fraught and violent encounter. In such circumstances, there is simply no reasonable opportunity for a "bystanding" officer to intercede on Mrs. Belluomini's behalf.

As for Mrs. Belluomini's pepper spray claim, Defendants claim that Officer Sanderson is entitled to qualified immunity because he "appropriately applied the use of force continuum" by using command presence, then verbal warnings, and then O.C. spray to obtain Mrs. Belluomini's compliance with an order to move away from Cole's Arrest Site. (Mot. at 10-11.) As noted above, these factual contentions are hotly disputed. A jury is entitled to decide which version it believes, and whether the use of O.C. spray against Mrs. Belluomini was excessive and objectively unreasonable under the circumstances.

On a superficial level, the question of whether Officer Sanderson is nonetheless entitled to qualified immunity, despite these fact issues, is a closer call in Mrs. Belluomini's case than in

Mr. Belluomini's case. As noted above, it was clearly established at the time of the incident that the use of pepper spray against a non-resistant subject is unconstitutional. *See Golden*, 2010 WL 3909476, at *7. However, even under the version of facts advocated by Plaintiffs, Mrs. Belluomini was overtly and deliberately interfering in the encounter between Cole and Officer Sanderson. She was by all accounts a resistant subject.

Viewing the use of O.C. spray against Mrs. Belluomini in isolation might suggest that reasonable officers could disagree about whether it was unlawful to douse her in pepper spray so as to remove her from the equation and focus on Cole. *See Malley v. Briggs*, 475 U.S. 335, 341 (1986) (noting that "if officers of reasonable competence could disagree . . . [then qualified] immunity should be recognized"). But the Court finds it would be error to decouple this use of force from the immediately preceding events. Plaintiffs allege that Officer Sanderson engaged in a truly brutal and gratuitous thrashing of Cole O'Balle. Officer Sanderson has not even moved for summary judgment on these claims. By this, he concedes that factual disputes prevent judgment as a matter of law as to whether he engaged in excessive force against Cole. These same factual disputes are material to, and potentially dispositive of, Officer Sanderson's qualified immunity defense against Mrs. Belluomini. While there may be a "hazy border" between an acceptable and an excessive use of pepper spray against an admittedly resistant subject, the haze dissipates when the action or order which the subject is resisting is itself clearly unlawful. *See Deville*, 567 F.3d at 169 ("These alleged facts"—i.e., that defendant employed significant force against a woman who refused to leave her car after being pulled over without probable cause—"are sufficiently egregious to warrant a denial of qualified immunity[.]"); *see also Jones v. City of Burkburnett*, 173 F. Supp. 2d 583, 587-88 (N.D. Tex. 2001) (finding allegations that "Defendants sprayed mace into the Plaintiff's eyes in order to coerce her into

consenting to a strip search for which they did not have probable cause" to be sufficient against the defendants' qualified immunity defense).

### 2.    The claims of Gil O'Balle

Officer Jonathan Longoria and Sergeant Andre Mitchell seek summary judgment on the claims asserted by Plaintiff Gilbert O'Balle. (Mot. at 9-10.) Gil O'Balle was parking his car at the time of Cole's encounter with Officer Sanderson, Officer Garcia, and Officer Longoria. As he approached the San Luis hotel from the parking lot, he received a call from his wife, alerting him to the fact that something was going on in the bar area. (Doc. No. 113-17, at 64-65.) Gil entered the hotel lobby and saw Mrs. Belluomini at the end of a long corridor, covered in pepper spray and with her hair in disarray. (*Id*. at 65.) Gil ran up to her and asked what was going on. She responded, "They're killing Cole." (*Id*. at 66.) Gil helped her into a nearby chair and told her not to move. He went to a door that opened to the H2o bar from the hotel. When he opened the door, he saw Mr. Belluomini on the ground, on his stomach, handcuffed and screaming for his wife. (*Id*. at 66.) When the three police officers standing over Mr. Belluomini noted Gil's presence, they yelled at him to shut the door and get out. (*Id*. at 79.)

Gil then exited the hotel. He approached a group of officers—including Officer Longoria and Sgt. Mitchell[8]—and asked who was in charge. (Doc. No. 113-17, at 84.) Officer Longoria already had his taser in hand when Gil approached. (Doc. No. 112-20, at 126-27.) The officers started advancing toward Gil, yelling that he needed to get back. (*Id*. at 85.) Almost simultaneously, Officer Longoria trained his taser on Gil. (Doc. No. 112-20, at 130-31.) Gil put his hands up and started walking backwards. (*Id*. at 85, 93; Doc. No. 112-17, at 22; Doc. No.

---

[8] The group also included Lt. Byron Frankland, Officer Douglas Balli, and an unidentified DEA agent. (Doc. No. 112-20, at 131-33.)

112-17, at 30.) Then he noticed Officer Sanderson walking Cole to a nearby police car. Cole was bleeding, handcuffed, and Officer Sanderson was yanking his hands up from behind, causing blood to spray from a massive wound on Cole's head. (Doc. No. 113-17, at 85.) Gil directed the attention of the officers in front of him to Cole, saying, "Did y'all see that? That's my son. Where are y'all taking him? What's going on? Who can I talk to?" (*Id*.) Gil continued to back up until he hit a retaining wall. (*Id*. at 85, 97; Doc. No. 112-18, at 11.) He heard an officer say, "Hit him. Hit him now." (Doc. No. 113-17, at 86.) Then he was tased by Officer Longoria. (Doc. No. 112-13, at 44; Doc. No. 112-16, at 7; Doc. No. 112-20, at 113.) Gil attempted, and may have succeeded, in pulling the taser wire out. (Doc. No. 113-17, at 99.) He heard an officer say, "Hit him again." He thinks he was tased again; this time, his knees buckled and he fell to the ground. (*Id*. at 99-100.)

Once on the ground, Gil was handcuffed by Lt. Byron Frankland and Sgt. Mitchell. (Doc. No. 112-15, at 30; Doc. No. 112-15, at 17.) Then an officer put a foot on Gil's head and ground his face into the pavement. (Doc. No. 113-17, at 100-01.) Officer Douglas Balli picked up Gil's head by his hair, pulled his glasses down, and pepper sprayed his face on both sides.[9] (*Id*. at 101-02.) Gil was kicked in the face, the side of the head, and the ribs. (*Id*. at 103.) Gil cannot identify which officers ground his face into the pavement, pepper sprayed him, or kicked him.

### a.    Officer Longoria

Gil claims that Officer Longoria used excessive force when he tased Gil. (Doc. No. 113-8, at 24-25.) Officer Longoria defends his actions by noting Gil's failure to comply with instructions to leave the area. (Mot. at 9-10.) According to Gil and other eyewitnesses, however, Gil was attempting to comply with Officer Longoria's instructions. He had backed up, with his

---

[9] Although Gil was unable to identify which officer pepper sprayed him, Officer Balli admits using pepper spray on Gil. (Doc. No. 112-15, at 18.)

hands in the air, until he ran into a retaining wall behind him. Moreover, Officer Longoria trained the taser on Gil immediately, simply because he had approached and asked a question, before any alleged resistance could even have taken place. At the time of his encounter with Gil, Officer Longoria was in the presence of at least four other police officers. Gil, by contrast, had only Plaintiff Aaron Trevino with him, and Mr. Trevino was actively trying to persuade Gil to leave the area. (Doc. No. 113-17, at 85; Doc. No. 113-20, at 19-20.) Under these circumstances—resolving all genuine factual disputes in Plaintiffs' favor—Officer Longoria is not entitled to summary judgment on the first prong of qualified immunity. *See Hobart v. City of Stafford*, 784 F. Supp. 2d 732, 747 ("Summary judgment is particularly inappropriate on the question of whether the use of force was excessive, as the 'balancing test requires careful attention to the facts and circumstances of each particular case.'") (quoting *Flores v. City of Palacios*, 381 F.3d 391, 399 (5th Cir. 2004)).

Additionally, the Court finds that, crediting Plaintiffs' version of events, it is "beyond debate" that Officer Longoria's decision to tase Gil O'Balle was objectively unreasonable under clearly established law. *See Tolan*, 713 F.3d at 306. None of the *Graham* factors supported the use of force against him. He was not suspected of having committed any serious crime; he posed no credible threat to the five police officers he confronted or to anyone else on the scene; and he was not actively resisting arrest or attempting to evade arrest. The complete absence of any justification for the use of force under *Graham* renders it an "obvious case" for denying qualified immunity. *See Newman*, 703 F.3d at 763-64; *see also Autin*, 174 Fed. App'x at 186. Moreover, at the time of the incident, it was clearly established that *any* use of force against a subject who is attempting to comply with an officer's instructions is unreasonable. *See Massey v. Wharton*, 477 Fed. App'x 256, 263 (5th Cir. 2012) (relying upon a 2005 Fifth Circuit case and "the clearly

established *Graham* factors" to conclude that "no reasonable police officer" would have believed it lawful to tase and pepper spray an individual who was "attempting to comply with the officers' commands, [] was not a threat to the officers or others, and [] was not attempting to flee, but was driving away at the [officer's] command").

Officer Longoria appears to bottom his qualified immunity argument on the proposition that a subject's failure to follow police orders, standing alone, may be sufficient justification for the use of force. As noted above, however, there is a genuine issue of fact regarding whether Gil failed to follow Officer Longoria's orders. Moreover, the Court disagrees with this articulation of the law on excessive force. It is true that a subject's failure to follow police orders is sometimes invoked as justification for use of force. *See, e.g.,*, *Buchanan v. Gulfport Police Dep't*, 530 Fed. App'x 307, 314 (5th Cir. 2013) ("Given [plaintiff's] failure to comply with [police] orders . . . [plaintiff] has not created a genuine dispute of material fact for whether [defendant] was acting in a manner that was 'clearly excessive to the need' and 'objectively unreasonable' when he attempted to subdue [plaintiff] by tasing him."); *see also Hobart v. City of Stafford*, Civil Action No. 4:09-cv-3332, 2010 WL 3894112, at *7 (S.D. Tex. Sept. 29, 2010) (listing allegation that decedent had not "fail[ed] to comply" with an order of the officer as relevant to whether plaintiffs had stated a plausible excessive force claim). But failure to comply with orders, as addressed in such cases, is not a separate and additional factor to be considered in the *Graham* framework; it is subsumed within the *Graham* factors themselves. For example, a subject's refusal to follow orders in the course of an arrest can be deemed active resistance or an attempt at flight. Likewise, a subject's refusal to reveal his hands upon demand can be viewed as evidence of a credible threat to police officers or civilians.

Here, Gil's alleged refusal to follow orders is properly considered under the first *Graham* factor: the severity of the crime that the suspect has committed or is committing. At most, his alleged refusal to leave the area constituted interference with a public servant, a Class B misdemeanor. (Doc. No. 112-12, at 7.) Under clearly established law, no reasonable officer would have believed it lawful to tase a subject for such a minor offense, particularly when the officer had not attempted to use any intermediate measures of force. *See Autin*, 174 Fed. App'x at 185-86 (finding a clear violation of plaintiff's Fourth Amendment rights when she was allegedly tased from behind without any notice and when her actions, if indeed unlawful, would constitute only a "minor" crime); *cf Galvan v. City of San Antonio*, 435 Fed. App'x 309, 311 (5th Cir. 2010) (explaining that officers' uses of force were reasonable because they involved "measured and ascending responses" to a suspect's noncompliance).

### b.    Sgt. Mitchell

Gil claims that Sgt. Mitchell used excessive force when he kneeled on, kicked, and struck Gil and when he forcefully pressed Gil's face into the concrete. (Doc. No. 113-6, at 15-16.) Sgt. Mitchell argues that there is no evidence he used any force on Gil beyond the force necessarily involved in handcuffing a subject. (Mot. at 10.) According to Sgt. Mitchell, he has been sued "merely because he was in the general vicinity of Gilbert O'Balle's arrest." (*Id*.)

According to Gil, during the course of his arrest, he was knelt upon; he was kicked; he was struck; he was pepper sprayed; and his face was ground into the concrete. He claims that all of these actions took place after he was prone on the ground and placed in handcuffs. Defendants have presented no evidence that Gil engaged in any behavior while handcuffed which justified a use of force. (Doc. No. 112-15, at 140-41.) Consequently, there is no legitimate dispute that the post-handcuffing acts of force alleged by Gil were objectively unreasonable and violated his

clearly established constitutional rights.[10] *See Bush*, 513 F.3d at 501-02 (finding it objectively unreasonable to employ force after plaintiff was "restrained and subdued"); *see also Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 847 (5th Cir. 2009) (finding factual dispute as to whether defendant performed a knee strike before or after plaintiff had been handcuffed material to the question of whether the knee strike was "objectively unreasonable"); *Gauglitz v. City of Dallas*, No. Civ. A. 3:95-CV-3123G, 1997 WL 786246, at *6 (N.D. Tex. Dec. 15, 1997) (denying summary judgment because "the repeated use of pepper spray against a bound, prone, and compliant citizen could easily be considered excessive"). The only remaining questions of fact are whether the acts actually occurred, and, if so, by whom.

On the first of these questions, Gil's testimony is sufficient to show a genuine dispute of fact. *See* FED. R. CIV. P. 56(c)(1)(A). Moreover, portions of his encounter with Officer Longoria and his subsequent arrest were captured on two separate video recordings. Neither recording disproves Gil's testimony of the events. *See Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (faulting lower court for relying on a party's version of the facts which was "blatantly contradicted" by video because "[this] version of events is so utterly discredited by the record that no reasonable jury could have believed him").

As to the question of which officer engaged in which act of force, it is true that Gil has not identified which officer knelt on him; which officer kicked him; which officer struck him; and which officer ground his face into the concrete.[11] However, summary judgment evidence shows that Lt. Frankland and Sgt. Mitchell were the only police officers with Gil in the time

---

[10] Plaintiffs' and Defendants' experts are in accord. (Doc. No. 117-14, at 3-4; Doc. No. 117-15, at 4; Doc. No. 117-16, at 14.)

[11] Additionally, Gil has not identified which officer pepper sprayed him in both eyes. However, Officer Balli admits to using O.C. spray on Gil. (Doc. No. 112-15, at 18.)

period during which these acts would have taken place. (Doc. No. 112-15, at 137-40.) Sgt. Mitchell denies engaging in the specific acts alleged by Gil, and he denies observing Lt. Frankland or any other officer engaging in those acts.[12] (Doc. No. 112-19, at 30.) Although a jury could find Sgt. Mitchell not credible, this possibility alone may not be enough to create a fact issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256-57 (1986) ("[D]iscredited testimony is not normally considered a sufficient basis for drawing a contrary conclusion.") (quotation marks and citation omitted). However, if the jury accepts that the acts of force actually occurred, it is inconsequential whether Sgt. Mitchell engaged in the acts of force or failed to intervene as another officer engaged in them. *See Hale*, 45 F.3d at 919; *see also Gilbert v. French*, 364 Fed. App'x 76, 83 (5th Cir. 2010) (recognizing that an officer "present at a scene involving another officer's use of excessive force" is potentially liable "for failure to intervene").

Plaintiffs have identified genuine issues of material fact as to whether Sgt. Mitchell engaged in or failed to intervene when another officer engaged in objectively unreasonable, excessive acts of force against Gil O'Balle after he had been handcuffed. Sgt. Mitchell is not entitled to summary judgment on qualified immunity.

### 3.    The claims of Calvin Silva

Officer Jeffrey Michael seeks summary judgment on the claim asserted by Plaintiff Calvin Silva.[13] (Mot. at 10-11.) Mr. Silva was in the H2o bar and observed Cole O'Balle's encounter with Officer Sanderson, Officer Garcia, and Officer Longoria from a close distance. Officer Michael—who was assisting with crowd control at the bar—pushed him in the chest and

---

[12] Lt. Frankland also denies engaging in these acts or observing Sgt. Mitchell or any other officer engage in these acts. (Doc. No. 112-15, at 121-22.)

[13] Calvin Silva also claims that Officer Dannie Simpson used excessive force against him. (3rd Am. Compl. ¶ 49.) Officer Simpson has not moved for summary judgment on Mr. Silva's claim. (Mot. at 14-15.)

told him to move back. (Doc. No. 112-17, at 31; Doc. No. 113-1, at 35.) Mr. Silva responded that

he did not have anywhere to go due to the crowd. (Doc. No. 112-17, at 31.) Officer Jonathon

Coward—who was also assisting with crowd control—hit Mr. Silva in the back with his

flashlight. (Doc. No. 113-19, at 67-68.) When Mr. Silva turned around, another officer hit him

with a baton across his collarbone. (*Id*. at 67.) Mr. Silva was also sprayed with pepper spray. (*Id*.

at 70.) He felt an officer jump on him or grab him, and he went to the ground. (*Id*.) He put his

arms above his head for protection, and he felt punches, kicks, and baton strikes all over his

body, predominantly in the rib area. (*Id*. at 71-72.) While he was on the ground, he was

handcuffed. After he was handcuffed, he felt a foot in his back "for a second." (*Id*. at 73.)

Approximately two minutes later, he was picked up off the floor and taken out. (*Id*. at 73, 75.)

Mr. Silva has never identified the officers involved in the alleged assault against him.

However, Officer Michael admits to pushing Mr. Silva (Doc. No. 113-1, at 35), and Officer

Coward admits to hitting Mr. Silva with his flashlight. (Doc. No. 112-15, at 50; Doc. No. 112-16,

at 8.) Additionally, Officer Michael testified that Officer Simpson either pushed Mr. Silva or

"hip tossed" him to the ground. (Doc. No. 113-1, at 35-36.)

Mr. Silva claims that Officer Michael used excessive force when he pushed Mr. Silva,

tackled him to the ground, and struck him in the upper body and head area. (Doc. No. 113-6, at

39.) Officer Michael argues that there is no evidence that he employed any force against Mr.

Silva other than a push as he conducted crowd control. (Mot. at 10-11.) Following this initial

push, Officer Michael continues, Mr. Silva was taken to the ground *by other officers*. (*Id*. at 11.)

Furthermore, Officer Michael argues that his push of Mr. Silva—"Soft Empty Hand Control"—

was not objectively unreasonable under the circumstances and did not violate Mr. Silva's clearly

established rights. (*Id*. at 11.)

As to Officer Michael's admitted pushing of Mr. Silva during the early stages of the Galveston Police Department's attempts to secure and control the H2o bar, the Court agrees that Officer Michael is entitled to qualified immunity on this claim. It is undisputed that, when Officer Michael initially pushed Mr. Silva, there was a great deal of commotion and chaos inside the bar. Patrons had begun to converge upon Cole's Arrest Site, either out of curiosity or as a result of contradictory police orders. In these circumstances, Officer Michael's decision to push Mr. Silva at the same time that he commanded him to move back—while perhaps unnecessary—was not so extraordinary or excessive to the circumstances that it violated Mr. Silva's clearly established rights. *See Graham*, 490 U.S. at 396 ("Not every push or shove . . . violates the Fourth Amendment.").

The remaining police activity of which Mr. Silva complains is infinitely more alarming. Under Plaintiffs' version of events, Mr. Silva was initially unable to comply with Officer Michael's order to back up due to circumstances beyond his control—the crowd behind him—which he verbally relayed to Officer Michael. Mr. Silva was then hit with a flashlight and a baton, pepper sprayed, tackled to the ground, and repeatedly punched, struck, and kicked all over his body. He was never asked to get down on the ground. He was never asked to put his hands behind his back. And he was never told that he was under arrest until he arrived at the jail later that night. (Doc. No. 113-19, at 75.) There is simply no question that this conduct was objectively unreasonable under clearly established law, if the jury accepts Mr. Silva's description of what happened to him. *See Newman*, 703 F.3d at 763-64; *Massey*, 477 Fed. App'x at 263; *Autin*, 174 Fed. App'x at 185; *Golden*, 2010 WL 3909476, at *7; *cf Galvan*, 435 Fed. App'x at 311.

Nonetheless, Officer Michael claims entitlement to summary judgment based on a lack of evidence as to whether *he* committed the above acts of force. But Officer Michael admits that he was present during and witnessed the events of Mr. Silva's arrest. (Doc. No. 113-1, at 32-36, 41.) He even admits to seeing some of the acts of force reported by Mr. Silva. (*Id.*) Officer Michael can be liable under Section 1983 either as a direct participant or as a bystander who failed to intervene as others violated Mr. Silva's clearly established rights. *See Hale*, 45 F.3d at 919; *Gilbert*, 364 Fed. App'x at 83. He is not entitled to summary judgment on Mr. Silva's remaining claims.

### 4.    The claims of Matthew Goodson

Officer Dane Goode and Lieutenant Joel Caldwell seek summary judgment on the claims asserted by Plaintiff Matthew Goodson. (Mot. at 12.) Following Cole O'Balle's arrest, Mr. Goodson and his girlfriend exited the H2o bar and were in a group of people leaving the San Luis property pursuant to police orders. (Doc. No. 117-23, at 5-6.) Multiple officers followed closely behind the group. (*Id.*) At least two officers, including Officer Jamie Benham, pushed people as they were leaving. (Doc. No. 112-15, at 28; Doc. No. 112-15, at 35; Doc. No. 117-23, at 6.) Mr. Goodson asked Officer Benham not to touch him or his girlfriend.[14] (Doc. No. 117-23, at 6.) As soon as he said this, Mr. Goodson was tackled to the ground by Officer Benham, Officer Christopher Doucette, and Officer Goode. (*Id.*; Doc. No. 112-15, at 24, 32; Doc. No. 112-13, at 4.) He was handcuffed. (Doc. No. 117-23, at 6.) As he was lying on the ground in handcuffs, he was kneed in the side and kicked in the head. (Doc. No. 117-23, at 6.) Lt. Caldwell

---

[14] Mr. Goodson does not identify the police officer to whom he was speaking, but indicates that the officer was pushing at him with a "stick." (Doc. No. 117-23, at 6.) He "guess[es]" it was Officer Goode. (*Id.* at 9.) However, Officer Benham admits to prodding people with his baton to get them to leave the property. (Doc. No. 112-15, at 35.)

then grabbed his hair, pulled his head back, and deployed O.C. directly in his eyes. (*Id*; Doc. No. 112-15, at 24, 32; Doc. No. 112-15, at 32; Doc. No. 113-14, at 38.)

### a. Officer Goode

Mr. Goodson claims that Officer Goode used excessive force when he threw Mr. Goodson to the ground and kneed and kicked him in the sides and on his head. (Doc. No. 113-5, at 51.) Officer Goode argues that there is no evidence he engaged in any act of force on the night in question, other than temporarily holding Cole O'Balle down after he was tased. (Mot. at 11-12.) Officer Goode also states that he did not arrest anyone that night. (*Id*. at 12.) The summary judgment record belies this claim; Officer Goode is listed as the arresting officer in Mr. Goodson's case. (Doc. No. 112-13, at 4.) From this fact, it is reasonable to infer that Officer Goode was personally involved in the events surrounding Mr. Goodson's arrest. Even if he was not personally responsible for delivering every kick or hit, he may still be liable under Section 1983 as a bystander who failed to intervene. *See Hale*, 45 F.3d at 919; *Gilbert*, 364 Fed. App'x at 83.

Although Officer Goode does not defend his actions during the course of Mr. Goodson's arrest under the rubric of qualified immunity—arguing instead that he had no involvement, despite being listed as the arresting officer in police department records—there is no doubt that fact issues prevent summary judgment on any qualified immunity claim. Under Plaintiffs' version of the facts, Mr. Goodson's sole "offense" that night was asking a police officer following him off the property to stop poking him and his girlfriend with a baton. As punishment for his offense, Mr. Goodson was tackled, kneed, and kicked. Under clearly established law, this response to solely verbal, non-threatening "incitement" from a civilian who is under no suspicion of illegal activity was objectively unreasonable. *See Newman*, 703 F.3d at 762-64 (force

allegedly used in response to an "off-color joke"); *see also Jimenez v. City of Costa Mesa*, 174 Fed. App'x 399, 403-04 (9th Cir. 2006) (reversing summary judgment because "[a] jury could conclude there was no need for force at all" in response to a "verbal inquiry" made from "eight to ten feet away" and "a reasonable officer under the circumstances would have had fair notice that the use of [even minimal] force on a non-arrestee, in response to a verbal inquiry from several feet away, was unlawful and that any mistake to the contrary would have been unreasonable") (quotation marks and citation omitted).[15] Because none of the *Graham* factors justifies the force employed against Mr. McMillan under his description of the events, Officer Goode is not entitled to qualified immunity on summary judgment. *See Newman*, 703 Fed. App'x at 763-64; *Autin*, 174 Fed. App'x at 186.

### b.      Lt. Caldwell

Mr. Goodson claims that Lt. Caldwell used excessive force when he deployed O.C. spray in Mr. Goodson's face after he had been handcuffed. (Doc. No. 113-5, at 51.) Defendants argue that Lt. Caldwell's use of O.C. spray against Mr. Goodson was justified because he observed Officer Doucette struggling with Mr. Goodson to effectuate an arrest. (Mot. at 12.) According to Mr. Goodson, however, he was sprayed with O.C. *after* he was handcuffed, while he was doing nothing more than lying on the ground. This factual dispute—whether Mr. Goodson was completely subdued at the time he was sprayed with O.C. by Lt. Caldwell—prevents summary judgment on qualified immunity. If Lt. Caldwell used O.C. spray against a subject who had

---

[15]  Although not directly on point, Eighth Amendment cases involving the use of force in response to prisoners' verbal provocations are instructive. *See, e.g., Lawrence v. Knighten*, 30 F.3d 1490, at *3 (5th Cir. 1994) ("[W]e cannot countenance a violent corporeal response to a verbal jab."); *Carter v. Wilkinson*, Civil Action No. 1:06-cv-02150, 2010 WL 5125499, at *3-4 (W. D. La. Dec. 9, 2010) (finding corrections officer's use of force against plaintiff "clearly excessive" when officer "lost his cool and attacked the [plaintiff]" because plaintiff had made a "sarcastic or dilatory" comment).

submitted to officers' control and was not resisting arrest, his actions were objectively unreasonable under clearly established law. *See Peterson*, 588 F.3d at 847; *Bush*, 513 F.3d at 501-02; *Gauglitz*, 1997 WL 786246, at *6; *see also Golden*, 2010 WL 3909476, at *7.

### 5. The claims of Michael McMillan

Officer Mathew Burus seeks summary judgment on the claims asserted by Plaintiff Michael McMillan. (Mot. at 12-13.) Mr. McMillan was in the H2o bar at the time of Cole O'Balle's arrest. He saw Cole on the ground, injured and handcuffed. (Doc. No. 113-15, at 32.) He also saw his friend, Brandon Backe, assaulted by a number of police officers near Cole's Arrest Site. [16] (*Id*. at 44-49.) Mr. McMillan said, "You guys can't do that." (*Id*. at 33.) A police officer grabbed him, turned him around, and started pushing him out of the bar, saying, "Get the fuck off the property." (*Id*.)

Once Mr. McMillan was outside the bar, he began walking down a hill. Three or four police officers—including Officer Burus—followed behind him, pushing him and yelling, "Get off the property." (Doc. No. 113-15, at 33.) The officers were holding Mr. McMillan's hands behind his back. (*Id*. at 51-52.) Mr. McMillan repeatedly told them he was leaving. (*Id*.) When he reached the edge of the grass, he said, "Believe me, I'm leaving. I saw what you just did to my friend." (*Id*. at 34.) One of the officers then said, "Get him," and the police officers jumped him. Mr. McMillan went to the ground, on his stomach, and was immediately handcuffed. He says that one police officer was on his neck, while another was on his back. (*Id*.)

---

[16] Mr. Backe was present in the H2o bar at the time of Cole's arrest and was the subject of several documented uses of force by Officers Nicholas McDermott, Rogelio Franco, and Christopher Doucette. (Doc. No. 112-16, at 25, 34-35.) Defendants do not seek summary judgment on Mr. Backe's claims, and the circumstances surrounding his arrest—which are contested—will not be recounted here.

Mr. McMillan claims that Officer Burus used excessive force when he pushed Mr. McMillan down a hill and threw him to the ground and across the hood of a police car. (Doc. No. 113-5, at 62.) For the reasons cited above, in the context of Mr. Silva's claims, the Court finds that Officer Burus is entitled to qualified immunity on the claim that he used excessive force when he pushed Mr. McMillan.

Officer Burus argues that his takedown of Mr. McMillan to effectuate his arrest was "proper tactical police protocol" under the circumstances. (Mot. at 13.) Officer Burus is undoubtedly correct that, in some situations, a forcible takedown is an appropriate means of establishing physical control over a suspect. However, it is vigorously contested whether any of the relevant factors were present in Mr. McMillan's case. According to Mr. McMillan, he had complied with police orders. He had left the bar and walked off the property. He was not intoxicated. Although he verbally criticized the police response that night, he made no attempts to disobey instructions or to interfere. By contrast, according to Officer Burus's initial arrest supplement, Mr. McMillan ignored Officer Burus's commands and was walking *toward* the area he was instructed to leave. (Doc. No. 112-14, at 2.)

The Court cannot resolve this kind of factual dispute on summary judgment. The dispute is material to Officer Burus's qualified immunity defense because using a forcible takedown to effectuate an arrest, when none of the *Graham* factors is present and the officer has not attempted to make the arrest through verbal commands alone, is objectively unreasonable under clearly established law. In such circumstances, no reasonable officer would have thought it lawful to use *any* amount of force. *See Newman*, 703 Fed. App'x at 763-64; *Autin*, 174 Fed. App'x at 186; *cf Galvan*, 435 Fed. App'x at 311. Moreover, if Mr. McMillan's version of events is credited by the jury, the force employed against him was a reaction to his comment "I saw

what you just did to my friend." Again, no reasonable officer would have thought it lawful to respond to Mr. McMillan's verbal criticism with *any* amount of force. *See Newman*, 703 F.3d at 762-64; *Jimenez*, 174 Fed. App'x at 403-04. Officer Burus is not entitled to qualified immunity on the summary judgment record.

### 6.    The claims of Chris Cornwell

Officer Dannie Simpson seeks summary judgment on the claims asserted by Plaintiff Chris Cornwell. (Mot. at 14-15.) Mr. Cornwell and his wife were in the H2o bar at the time of Cole O'Balle's arrest. They left the bar on police orders and began walking down a hill to their hotel down the street.[17] (Doc. No. 113-14, at 35.) A number of police officers followed behind them, pushing them and telling them to keep moving. Mr. Cornwell asked one of the officers— Officer Simpson—to stop pushing them, because he and his wife were leaving, his wife was pregnant, and she was wearing high heels. Officer Simpson asked him what he said, and Mr. Cornwell repeated it. Officer Simpson then threw him to the ground. (*Id*. at 36.) Mr. Cornwell felt strong pressure on his neck, head area, and face as he was being handcuffed. (*Id*. at 37.) He was never told he was under arrest and was never asked to put his hands behind his back. (*Id*. at 39.)

After he was handcuffed, Mr. Cornwell was placed on a curb with other detainees. (Doc. No. 113-14, at 41.) He could see that his wife, still walking away, was still being pushed from behind by officers. (*Id*.) Mr. Cornwell said to Officer Simpson, "She's pregnant. Can you please stop pushing her?" Officer Simpson grabbed him, rolled him over so that his left side was on the concrete, and pressed his face into the ground. (*Id*. at 42.)

---

[17] Mr. Cornwell and his wife were in the same group of people departing the San Luis property as Mr. Goodson and his girlfriend. *See* Section III.B.4, above.

Mr. Cornwell claims that Officer Simpson used excessive force when he threw him to the ground and repeatedly pressed his neck, head, and face into the ground. (Doc. No. 113-5, at 41; Doc. No. 113-7, at 48.) Officer Simpson claims that his actions were objectively reasonable because Mr. Cornwell was cursing and refused to comply with police commands. (Mot. at 14.) He defends the manner in which he arrested Mr. Cornwell as consistent with police protocol. (*Id*. at 15.) Once again, genuine issues of material fact preclude summary judgment on Officer Simpson's qualified immunity defense. Plaintiffs' version of events suggest that Mr. Cornwell—like Mr. Goodson and Mr. McMillan—was subjected to force solely as punishment for his verbal criticism of the police response.  No reasonable police officer would have believed such conduct to be lawful. *See Newman*, 703 F.3d at 762-64; *Jimenez*, 174 Fed. App'x at 403-04. Additionally, despite being under no suspicion of criminal activity, presenting no threat to the officers or others, and complying with every police order given to him, Mr. Cornwell—like Mr. Silva, Mr. Goodson, and Mr. McMillan—was subjected to a forcible takedown without any opportunity to submit voluntarily to the officers' control. This was objectively unreasonable under clearly established law. *See Newman*, 703 Fed. App'x at 763-64; *Autin*, 174 Fed. App'x at 186; *cf Galvan*, 435 Fed. App'x at 311. Officer Simpson is not entitled to qualified immunity on the summary judgment record.

### 7.    The claims of Justin Packard

Officer John Rutherford seeks summary judgment on the claims asserted by Plaintiff Justin Packard. (Mot. at 15-16.) Mr. Packard was in the H2o bar when police officers entered and ordered everyone to leave. (Doc. No. 113-18, at 26-28.) Mr. Packard exited the bar and saw his friend, Raymond Guidry, slammed by an officer against a pillar. (*Id*. at 30.) Mr. Guidry was

yelling that he hadn't done anything. (*Id*.) The officer holding Mr. Guidry told Mr. Packard to keep walking, and he complied. (*Id*. at 32.)

Mr. Packard continued off the San Luis property with a group of friends. (*Id*. at 28, 32.) Following approximately 20 feet behind was a group of approximately five male police officers. (*Id*. at 35.) This group included Officer Rutherford and Officer Benham. (Doc. No. 112-14, at 1; Doc. No. 112-21, at 62; Doc. No. 112-15, at 36.)

The officers ordered Mr. Packard to stop—identifying him by the shirt he was wearing— and then ordered him to keep going. This happened a couple of times. (Doc. No. 113-18, at 33-34.) Mr. Packard was confused by the contradictory orders. (*Id*. at 36.) As a result, he ended up "straggl[ing]" behind his friends. (*Id*. at 34.) When he reached the parking lot of a nearby IHOP, he turned around, with his hands up, to ask the officers behind him what had happened. (*Id*. at 34.) He was grabbed by the neck, thrown down, and handcuffed. An officer sprayed his face with pepper spray. (*Id*. at 34-35.)

Mr. Packard claims that Officer Rutherford used excessive force when he threw him to the ground, knelt on his back, pressed his face into the pavement, and deployed pepper spray in his face. (Doc. No. 113-6, at 29.) Officer Rutherford counters that it was objectively reasonable for him to take Mr. Packard into custody because Mr. Packard exhibited signs of public intoxication. (Mot. at 15-16.) Officer Rutherford also defends his manner of effectuating the arrest as consistent with proper police training. (*Id*. at 16.)

Officer Rutherford's version of events is diametrically opposed to Mr. Packard's version. On summary judgment, the Court is not tasked with resolving issues of material fact. If the jury credits Mr. Packard's testimony, there is no question that the force employed against him was objectively unreasonable under clearly established law. Mr. Packard had already complied with

police orders by leaving the San Luis property. *See Massey*, 477 Fed. App'x at 263. He was not under suspicion of having committed any serious crime, and he posed no credible threat to the officers or to others. *See Newman*, 703 F.3d at 763-64; *Autin*, 174 Fed. App'x at 185. He was subjected to a forcible takedown without any opportunity to submit to the officers' control. *Cf Galvan*, 435 Fed. App'x at 311. And he was pepper sprayed *after* he was prone and handcuffed. *See Peterson*, 588 F.3d at 847; *Bush*, 513 F.3d at 501-02; *Gauglitz*, 1997 WL 786246, at *6; *see also Golden*, 2010 WL 3909476, at *7. Due to unresolved material fact issues regarding the force employed in Mr. Packard's arrest, Officer Rutherford is not entitled to summary judgment on qualified immunity.

### 8.     The claims of Charles Young

Officer Evelyn Dooley and Officer Pheneria Mims Manuell seek summary judgment on the claims asserted by Plaintiff Charles Young. (Mot. at 16-17.)

Mr. Young was in the H2o bar when police officers entered and ordered everyone to leave. (Doc. No. 113-21, at 41-44.) Mr. Young complied with these instructions and moved toward the exit. As he was walking out, Officer Robert Tovar grabbed him and said, "You're under arrest."[18] (*Id*. at 56.) Mr. Young complied with Officer Tovar's order to put his hands behind his back, and he was handcuffed. (*Id*. at 53, 56-57.) Officer Tovar and another officer then pushed Mr. Young through the crowd and down a flight of stairs. (*Id*.) They ended up near the valet area outside. The two officers slammed Mr. Young face-down on the ground, with his hands still cuffed behind him. The officers, along with Officer Dooley and Officer Manuell, then "beat the stew out of [him] for a little bit."[19] (*Id*. at 54; Doc. No. 113-15, at 56-57.)

---

[18] Mr. Young has not identified the officer who originally arrested him. However, Officer Tovar admits to arresting Mr. Young as he was exiting the H2o bar. (Doc. No. 112-15, at 15.)

Eventually, the officers stopped hitting Mr. Young. He sat up. (Doc. No. 113-21, at 58.)
He noticed that one of his handcuffs had fallen off, so he placed his hands on his knees in front
of him. A black female police officer—Officer Dooley or Officer Mims—saw him put his hands
in front of him. She ran at Mr. Young and yelled, "Stop resisting!" Then she kicked him in the
face. (*Id.* at 59.) Mr. Young did not have enough time to respond to her verbal command before
she kicked him. (*Id.*) Mr. Young heard her say, "I'm going to fuck you up." (*Id.* at 61; Doc. No.
113-15, at 35.)

When Mr. Young was kicked in the face, he fell back onto the ground. (Doc. No. 113-21,
at 61.) Before he could move, Officer Dooley, Officer Manuell, and Lt. Frankland were on top of
him.[20] (*Id.* at 62.) He was turned over on his stomach. He felt a knee in his back and a foot on his
neck. He was handcuffed. Several officers were hitting him. (*Id.* at 61-62.) He describes getting
"the beating of my life." (*Id.* at 61.)

Mr. Young thinks that he was tased during the second beating. He saw a police officer
withdraw a taser, and heard him say, "We're going to tase you." (Doc. No. 113-21, at 61-62.)
Then he blacked out. When he woke up, he had marks on his shoulder that appeared to be from a
taser. (*Id.* at 63.) During the second beating, Mr. Young remembers shouting, "I'm not resisting."
(*Id.* at 65.)

---

[19] Mr. Young has not identified the officers who participated in the first beating. However,
Officer Dooley admits that when she and Officer Manuell arrived on scene, they saw Mr. Young
struggling with an out-of-town officer. Officer Dooley and Officer Manuell went to the out-of-
town officer's assistance. (Doc. No. 112-15, at 38.)

[20] Mr. Young has not identified the officers who piled on top of him during the second beating.
However, Sgt. Mitchell observed Officer Dooley, Officer Manuell, and Lt. Frankland struggling
with a suspect whose handcuffs had come off. (Doc. No. 112-16, at 11.) Officer Dooley, Officer
Manuell, and Lt. Frankland all admit to some involvement in re-handcuffing Mr. Young.
Notably, Lt. Frankland admits to kicking Mr. Young on his right side and to kneeling on Mr.
Young's chest and side. (Doc. No. 112-15, at 30.)

Mr. Young claims that Officer Dooley used excessive force when she knelt on his back, stepped on his neck, struck his body, and pressed his face into the pavement. (Doc. No. 113-7, at 2-3; Doc. No. 113-8, at 62.) Mr. Young claims that Officer Manuell used excessive force when she kicked him in the face, knelt on his back, stepped on his neck, struck his body, and pressed his face into the pavement. (Doc. No. 113-7, at 2-3; Doc. No. 113-8, at 64.)

Officer Dooley and Officer Manuell argue that they are entitled to qualified immunity because Mr. Young was combative and intoxicated and because their methods of effectuating the arrest were proper pursuant to police protocol. (Mot. at 16-17.) Genuine issues of material fact preclude summary judgment on their qualified immunity defenses. Defendants' version of the events surrounding Mr. Young's arrest bear no resemblance whatsoever to Plaintiffs' version of the events. The Court is not empowered to resolve these issues of material fact on summary judgment. If the jury credits Mr. Young's testimony, there is no question that the force employed against him was objectively unreasonable under clearly established law. According to Mr. Young, he was attempting to comply with police orders to evacuate the bar when he was arrested with no explanation. He submitted to police authority, allowing himself to be handcuffed and taken outside. Once there, he was beaten for no reason by multiple officers—while still handcuffed. After his handcuffs came loose, and before he could alert anyone or demonstrate that he was not resisting his arrest, he was beaten a second time. Mr. Young, without any protest, had placed himself under the authority and control of the Galveston Police Department. For his acquiescence, he was savagely beaten by not one, but several officers. Such actions—if accepted as true by a jury—were objectively unreasonable under clearly established law. *See Peterson*, 588 F.3d at 847; *Bush*, 513 F.3d at 501-02; *Gauglitz*, 1997 WL 786246, at *6.

IV.     **CONCLUSION**

The factual disputes in this case are legion; irreducible on summary judgment; and largely material to the Individual Defendants' abilities to invoke qualified immunity. Only the crucible of trial can determine which version of the events of October 4-5, 2008 is to be believed.

For the reasons provided above, Individual Defendants' Motion for Summary Judgment (Doc. No. 111) is **GRANTED** as to Plaintiff Sharon Belluomini's claim that she was subjected to excessive force when she was lifted by her hair by an unknown defendant; **GRANTED** as to Plaintiff Calvin Silva's claim that he was subjected to excessive force when he was pushed by Defendant Jeffrey Michael; and **GRANTED** as to Plaintiff Michael McMillan's claim that he was subjected to excessive force when he was pushed by Defendant Mathew Burus. In all other respects, the Motion is **DENIED**.

     **IT IS SO ORDERED**.

     **SIGNED** this the twenty-seventh day of February, 2014.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE