# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **BRANDON A. BACKE, et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| **v.** | § | **CIV. NO. 10-CV-388** |
| | § | |
| **CITY OF GALVESTON, TEXAS, et al.** | § | |
| | § | |
| **Defendants.** | § | |

## <u>MEMORANDUM AND ORDER</u>

Plaintiffs in this case claim that at least twenty members of the Galveston Police Department abused their positions of authority when they engaged in or failed to prevent multiple acts of unprovoked and unwarranted force on the very population of people they were sworn to protect. Some, but not all, of the officer defendants sued in this case filed a motion for summary judgment bottomed on qualified immunity. By separate order, the Court largely denied the officer defendants' motion due to unresolved questions of material fact. (Doc. No. 129.)

The Court now confronts the difficult question of when a municipality can be held liable for the discretionary acts of force committed by its police force. Defendant City of Galveston, Texas ("the City" or "Galveston") has filed a Motion for Summary Judgment. (Doc. No. 112.) Plaintiffs have responded (Doc. No. 118), and the City has replied (Doc. No. 126).[1] After considering the Motion, all responses thereto, and the applicable law, the Court finds that the City's Motion for Summary Judgment (Doc. No. 112) must **GRANTED IN PART** and **DENIED IN PART**.

---

[1] The City's reply was ten days overdue. Although the Court does not approve of the City's unexplained failure to move for an extension or for leave to file a late reply, it also cannot conceive how the delay prejudiced Plaintiffs. Therefore, Plaintiffs' Motion to Strike Galveston's Reply as Untimely (Doc. No. 127) is **DENIED**.

## I.     FACTUAL BACKGROUND

### A.     Chief Wiley's Hire

Charles Wiley was sworn in as the Chief of Police of the Galveston Police Department on July 1, 2008. (Doc. No. 112-11, at 14.) He was hired from outside the Galveston Police Department—the first time in decades that the Galveston Chief of Police was not promoted from within. (*Id*. at 21.) The City Manager, Steven LeBlanc, pursued and selected an outside hire for the express purpose of effecting change within the police department. (*Id*. at 29; Doc. No. 112-10, at 56-57.)

The police department inherited by Chief Wiley in July 2008 was "plagued with activities that oftentimes were illegal, most of the time unethical." (Doc. No. 119-2, at 4.)  Use of force was a "big issue" within the department itself (Doc. No. 119-1, at 3) and within the City administration more generally; earlier in 2008, the City Council discussed numerous complaints against the department, including "police brutality." (Doc. No. 112-10, at 53-54.) The public perception of the Galveston police force was so dismal that the department had ceased communications with the local newspaper. (Doc. No. 112-11, at 30.) According to Chief Wiley, "the perception amongst citizens in Galveston was that the police department was not as professional as it could be." (*Id*. at 30.)

Chief Wiley viewed his arrival as a "paradigm shift" within the department. (Doc. No. 119-4, at 4.) He described the environment upon his arrival as one in which "lax behavior" was "permitted." (*Id*. at 47-48.) He hoped to instill more accountability and responsibility throughout the ranks, and particularly within the leadership of the department. (Doc. No. 112-11, at 33-35; Doc. No. 119-1, at 3.) He also planned to institute a "community policing culture." (Doc. No.

112-11, at 30-31.) Hurricane Ike, however, delayed the implementation of any reforms. (*Id*. at 53.)

**B.      The H2o Incident (October 4-5, 2008)[2]**

On October 4, 2008—three weeks after Hurricane Ike hit the island—Plaintiffs (excluding Plaintiff Charles Young) attended a wedding at the Galveston Island Convention Center. Following the reception, which ended around 11 p.m., many guests went to the adjacent San Luis Resort and congregated at H2o, the hotel's bar.

**1.      The encounter with Cole O'Balle, Joseph Belluomini, and Sharon Belluomini**

Officer Chris Sanderson—a member of the Galveston Police Department—was working security at H2o that night. Another security officer employed by the hotel, Carlos Gonzales, directed Officer Sanderson's attention to Daniel "Cole" O'Balle, the bride's 19-year-old brother, who had just entered the bar. Mr. Gonzales alerted Officer Sanderson to Cole for some combination of the following reasons: Cole had been belligerent with Mr. Gonzales at the wedding reception in the adjacent convention center; Cole appeared to be intoxicated despite being underage; and Cole had carried an outside alcoholic beverage into the H2o bar. Officer Sanderson and Mr. Gonzales approached Cole and physically escorted him to the northeast side of the bar, near the bar's restrooms. Much of the relevant activity in this case occurred at this location. For simplicity, the Court will refer to it as "Cole's Arrest Site."

---

[2] In this section, the Court summarizes events depicted in its prior memorandum and order on the Individual Defendants' Motion for Summary Judgment—depictions which are hereby incorporated for purposes of the City's motion—and presents in more fine detail the acts of force not implicated by that motion. Due to the extreme divergence in the Plaintiffs' and Defendants' versions of the events, it is impossible to present a unified narrative of what happened that night. The Court uses the facts most supportive of Plaintiffs' claims. All reasonable inferences are drawn in Plaintiffs' favor.

Cole, Officer Sanderson, and Mr. Gonzales were followed by Joseph Belluomini, Sharon Belluomini, and Michael Patterson—friends of the O'Balle family. Mrs. Belluomini stopped to talk with Mr. Gonzales. Mr. Gonzales informed her that he was having Cole arrested. Mrs. Belluomini begged Mr. Gonzales and Officer Sanderson to let her take Cole up to his hotel room.

Mr. Belluomini placed himself in front of Cole, whose back was against a wall. Mr. Belluomini put his hands on the wall on either side of Cole, such that Cole was between his arms. He alternated between reassuring Cole that everything would be fine and inquiring of Officer Sanderson what Cole had done wrong.

Sometime during the course of these interactions, Officer Sanderson radioed for assistance from fellow officers. Officer Clemente Garcia and Officer Jonathan Longoria were the first to arrive in response to Officer Sanderson's request.

Shortly before Officer Garcia and Officer Longoria reached Cole's Arrest Site, Officer Sanderson withdrew his baton. Officer Garcia rushed past Mrs. Belluomini and punched Cole in the head. Simultaneously, Mr. Gonzales placed Mr. Belluomini in a chokehold, pulling him away from Cole, and Officer Sanderson pepper sprayed Mr. Belluomini in the face.

Officer Garcia and Officer Sanderson then proceeded to pummel Cole—Officer Garcia with his fists, and Officer Sanderson with his baton. One of these baton strikes hit Cole on the head, causing a massive head wound. Despite the fact that Cole was wounded and not fighting back, Officer Longoria tased Cole in the abdomen, causing him to fall to the ground. Officer Garcia and Officer Sanderson continued to punch, strike, and kick Cole after he was on the ground.

Mrs. Belluomini screamed for the officers to stop. When the abuse continued unabated, she threw herself on Cole's head to protect him. One of the officers removed her by her hair, and

Officer Sanderson pepper sprayed her in the face. Cole was eventually handcuffed and removed to a patrol car.

In the thirteen minutes following Officer Sanderson's initial request for assistance from fellow officers, over twenty members of the Galveston Police Department arrived on scene, many of them accompanied by other federal and local law enforcement officials. (Doc. No. 112-12, at 10-12.) Most of these officers engaged in crowd control, evacuating the H2o bar and escorting people off the San Luis property. As described below, the remaining claims of excessive force derive in some form from this police activity.

### 2.    The encounter with Calvin Silva

Calvin Silva was in the H2o bar and observed Cole's encounter with Officer Sanderson, Officer Garcia, and Officer Longoria from a close distance. Officer Jeffrey Michael pushed Mr. Silva in the chest and told him to move back. Mr. Silva responded that he did not have anywhere to go due to the crowd. Officer Jonathon Coward then hit Mr. Silva in the back with his flashlight. When Mr. Silva turned around, another officer hit him with a baton across his collarbone. Mr. Silva was pepper sprayed. He felt an officer jump on him or grab him, and he went to the ground. He put his arms above his head for protection, and he felt punches, kicks, and baton strikes all over his body, predominantly in the rib area. While he was on the ground, he was handcuffed. After he was handcuffed, he felt a foot in his back "for a second." Approximately two minutes later, he was picked up off the floor and taken out.

Mr. Silva has never identified the officers involved in the alleged assault against him. However, Officer Michael admits to pushing Mr. Silva, and Officer Coward admits to hitting Mr. Silva with his flashlight. Additionally, Officer Michael testified that Officer Dannie Simpson either pushed Mr. Silva or "hip tossed" him to the ground.

### 3.     The encounter with Brandon Backe

Brandon Backe—at the time, a pitcher employed by the Houston Astros—was also in the H2o bar at the time of Cole's encounter with Officer Sanderson, Officer Garcia, and Officer Longoria. He first noticed a commotion when he heard someone yell frantically, "They've got Cole." (Doc. No. 113-9, at 47.) Mr. Backe walked to the back of the bar to investigate. (*Id*. at 48.) When he arrived at Cole's Arrest Site, Cole was on the ground, handcuffed and face down, covered in blood. (*Id*. at 51, 53.) Officer Longoria was standing next to Cole holding a taser, with the wires still attached to Cole's back. (*Id*.) Mr. Backe saw people nearby being "manhandled and pepper sprayed" by other officers. (*Id*. at 51-52.)

There were four or five officers around Cole's Arrest Site when Mr. Backe arrived. (Doc. No. 113-9, at 58.) The officer closest to him—Officer Nicholas McDermott—screamed at the crowd to "back the fuck up." (*Id*. at 61.) Mr. Backe—who was at the front of the crowd and could not retreat due to the people behind him—raised his hands and responded, "Chill out." (*Id*. at 61, 65; Doc. No. 112-17, at 33.) Officer McDermott got closer and repeated in an even louder voice, "Back the fuck up right now." (Doc. No. 113-9, at 61.) Mr. Backe said, "Chill out. I can't go anywhere. Y'all have enough room." (*Id*.) Officer McDermott then grabbed Mr. Backe and threw him against a wall. (*Id*.) He started grabbing for Mr. Backe's hands behind his back. (Doc. No. 113-10, at 3.) Then he threw Mr. Backe on the ground, into the landscaping. (*Id*. at 3-4.)

Mr. Backe felt officers getting on top of him. (Doc. No. 113-9, at 4.) He felt something—possibly a knee—hit him at the intersection of his neck and back. (*Id*. at 4-5.) When he looked up to ask why he was being attacked, he was punched repeatedly in the face. (*Id*.) Mr. Backe put his

face into the ground for protection, and he was punched repeatedly in the side of the head. (*Id*. at 4-5.) He was handcuffed. (*Id*. at 5.) Then he was kicked in the face. (*Id*.)

Multiple officers were involved in the scuffle with Mr. Backe, including Officer McDermott, Officer Rogelio Franco, and Officer Christopher Doucette. All three officers admit to punching Mr. Backe in the face or head. (Doc. No. 112-14, at 4; Doc. No. 112-15, at 23; Doc. No. 112-15, at 39.)

### 4.    The encounter with Gil O'Balle and Aaron Trevino

Gil O'Balle was parking his car at the time of Cole's encounter with Officer Sanderson, Officer Garcia, and Officer Longoria. As he approached the San Luis hotel from the parking lot, he received a call from his wife, alerting him to the fact that something was going on in the bar area. Gil entered the hotel lobby and saw Mrs. Belluomini wandering a hallway, covered in pepper spray and with her hair in disarray. She told him, "They're killing Cole." Gil helped her into a nearby chair, then entered the H2o bar.  He saw Mr. Belluomini on the ground, on his stomach, handcuffed and screaming for his wife. When the three police officers standing over Mr. Belluomini noted Gil's presence, they yelled at him to get out.

Gil exited the hotel. He approached a group of officers—including Officer Longoria, Sgt. Andre Mitchell, Lt. Byron Frankland, Officer Douglas Balli, and an unidentified DEA agent—to ask who was in charge. Officer Longoria had his taser in hand when Gil approached. The officers advanced on Gil, yelling that he needed to get back. Officer Longoria trained his taser on Gil. Gil put his hands up and started walking backwards. He was joined by Aaron Trevino—another wedding guest—who told him that they needed to leave. (Doc. No. 113-20, at 19.) Mr. Trevino faced Gil, with his back to the officers. (*Id*. at 19-20.) As Gil backed up, Mr. Trevino walked forward. (*Id*.)

Then Gil noticed Cole being walked to a nearby police car. Gil said to the officers, "That's my son. Where are y'all taking him? What's going on? Who can I talk to?" Gil continued to back up until he hit a retaining wall. He heard an officer say, "Hit him. Hit him now." Then he was tased by Officer Longoria. Gil attempted, and may have succeeded, in pulling the taser wire out. He heard an officer say, "Hit him again." He was tased again; this time, his knees buckled and he fell to the ground.

Once on the ground, Gil was handcuffed by Lt. Frankland and Sgt. Mitchell. Then an officer put a foot on Gil's head and ground his face into the pavement. Officer Balli picked up Gil's head by his hair, pulled his glasses down, and pepper sprayed his face on both sides. Gil was kicked in the face, the side of the head, and the ribs. Gil cannot identify which officers ground his face into the pavement, pepper sprayed him, or kicked him.

Near the time that Officer Longoria tased Gil, Lt. Frankland hit Mr. Trevino with his baton in the back of the leg, which caused Mr. Trevino to fall to the ground.[3] (Doc. No. 113-20, at 21.) Once he was on the ground, Lt. Frankland hit him twice more. (*Id*. at 31.) Mr. Trevino rolled over and put his hands up. (*Id*. at 19.) Officer Balli pepper sprayed him in the face.[4] (*Id*.)

### 5.    The encounter with Michael McMillan

Michael McMillan was in the H2o bar at the time of Cole's arrest. He saw Cole on the ground, injured and handcuffed. He also saw Mr. Backe assaulted by a number of police officers near Cole's Arrest Site. Mr. McMillan said, "You guys can't do that." A police officer grabbed

---

[3] Mr. Trevino has not identified the officer who hit him with a baton. However, video of the encounter shows Lt. Frankland withdrawing his baton as he approached Mr. Trevino and Gil O'Balle. (Doc. No. 113-2, at 86-87.)

[4] Mr. Trevino has not identified the officer who pepper sprayed him. However, Lt. Frankland reports that Officer Balli pepper sprayed Mr. Trevino. (Doc. No. 113-2, at 107-08.)

him, turned him around, and started pushing him out of the bar, saying, "Get the fuck off the property."

Once Mr. McMillan was outside the bar, he began walking down a hill. Three or four police officers—including Officer Mathew Burus—followed behind him, pushing him and yelling, "Get off the property." Mr. McMillan repeatedly told them he was leaving. When he reached the edge of the grass, he said, "Believe me, I'm leaving. I saw what you just did to my friend." One of the officers then said, "Get him," and the police officers jumped him. Mr. McMillan went to the ground, on his stomach, and was immediately handcuffed. He says that one police officer was on his neck, while another was on his back.

### 6.    The encounters with Matthew Goodson and Chris Cornwell

Following Cole's arrest, Matthew Goodson and his girlfriend exited the H2o bar and joined a group of people leaving the San Luis property pursuant to police orders. Multiple officers followed closely behind the group. At least two officers, including Officer Jamie Benham, pushed people as they were leaving. Mr. Goodson asked Officer Benham not to touch him or his girlfriend. As soon as he said this, Mr. Goodson was tackled to the ground by Officer Benham, Officer Doucette, and Officer Dane Goode. He was handcuffed. As he was lying on the ground in handcuffs, he was kneed in the side and kicked in the head. Lt. Joel Caldwell then grabbed his hair, pulled his head back, and deployed oleoresin capsicum ("O.C." or "pepper spray") directly in his eyes.

Chris Cornwell and his wife were in the same group of people departing the San Luis Property as Mr. Goodson and his girlfriend. They were also pushed from behind as they left. Mr. Cornwell asked one of the officers—Officer Simpson—to stop pushing them, because he and his wife were leaving, his wife was pregnant, and she was wearing high heels. Officer Simpson

asked him what he said, and Mr. Cornwell repeated it. Officer Simpson then threw him to the ground. Mr. Cornwell felt strong pressure on his neck, head area, and face as he was being handcuffed. He was never told he was under arrest and was never asked to put his hands behind his back.

After he was handcuffed, Mr. Cornwell was placed on a curb with other detainees. He could see that his wife, still walking away, was still being pushed from behind by officers. Mr. Cornwell said to Officer Simpson, "She's pregnant. Can you please stop pushing her?" Officer Simpson grabbed him, rolled him over so that his left side was on the concrete, and pressed his face into the ground.

### 7.      The encounters with Raymond Guidry and Justin Packard

Justin Packard was in the H2o bar when police officers entered and ordered everyone to leave. Mr. Packard exited the bar and saw his friend, Raymond Guidry, slammed by Officer Robert Sanderson—Officer Chris Sanderson's brother—against a pillar. (Doc. No. 112-13, at 41.) Mr. Guidry was yelling that he hadn't done anything. Officer R. Sanderson instructed Mr. Packard to keep walking, and he complied.

Mr. Packard continued off the San Luis property with a group of friends. Following approximately 20 feet behind was a group of approximately five male police officers. This group included Officer John Rutherford—Officer Robert Sanderson's partner—and Officer Benham.

The officers ordered Mr. Packard to stop—identifying him by the shirt he was wearing— and then ordered him to keep going. This happened a couple of times. Mr. Packard was confused by the contradictory orders. As a result, he ended up "straggl[ing]" behind his friends. When he reached the parking lot of a nearby IHOP, he turned around, with his hands up, to ask the officers

behind him what had happened. He was grabbed by the neck, thrown down, and handcuffed. An officer sprayed his face with pepper spray.

Mr. Guidry and Mr. Packard were transported to the city jail together. (Doc. No. 113-18, at 41-42.) After their police car arrived at the jail, Mr. Packard heard Mr. Guidry being removed from the car. Then he heard Mr. Guidry scream. (Doc. No. 113-18, at 41-42.) Mr. Guidry confirms that he was pepper sprayed after he arrived at the jail. (Doc. No. 112-17, at 25.)

### 8.   The encounter with Charles Young

Mr. Young was in the H2o bar when police officers entered and ordered everyone to leave. Mr. Young complied with these instructions and moved toward the exit. As he was walking out, Officer Robert Tovar grabbed him and said, "You're under arrest." Mr. Young complied with Officer Tovar's order to put his hands behind his back, and he was handcuffed. Officer Tovar and another officer then pushed Mr. Young through the crowd and down a flight of stairs. They ended up near the valet area outside. The two officers slammed Mr. Young face-down on the ground, with his hands still cuffed behind him. The officers, along with Officer Dooley and Officer Manuell, then "beat the stew out of [him] for a little bit."

Eventually, the officers stopped hitting Mr. Young. He sat up. He noticed that one of his handcuffs had fallen off, so he placed his hands on his knees in front of him. A black female police officer—Officer Dooley or Officer Mims—saw him put his hands in front of him. She ran at Mr. Young and yelled, "Stop resisting!" Then she kicked him in the face. Mr. Young did not have enough time to respond to her verbal command before she kicked him. Mr. Young heard her say, "I'm going to fuck you up."

When Mr. Young was kicked in the face, he fell back onto the ground. Before he could move, Officer Dooley, Officer Manuell, and Lt. Frankland were on top of him. He was turned

over on his stomach. He felt a knee in his back and a foot on his neck. He was handcuffed. Several officers were hitting him. He describes getting "the beating of my life."

Mr. Young thinks that he was tased during the second beating. He saw a police officer withdraw a taser, and heard him say, "We're going to tase you." Then he blacked out. When he woke up, he had marks on his shoulder that appeared to be from a taser. During the second beating, Mr. Young remembers shouting, "I'm not resisting."

### C.   Reporting and investigation of the H2o incident

Lt. Joel Caldwell was the ranking officer and on-scene commander at the H2o incident. (Doc. No. 112-11, at 67.) Chief Wiley briefly visited the scene that night. He told Lt. Caldwell to make sure that the reports were thorough, and he departed. (*Id*. at 72-73.) The next day—October 5, 2008—Chief Wiley pulled the initial police reports from the incident. He instantly knew, from the lack of heft alone, that the reports were deficient. (*Id*. at 74.) Moreover, no use of force forms had been filled out, despite the fact that—at a minimum—the night had involved use of a taser, the physical detainment of Mr. Backe, O.C. spray, and a "scuffle" that produced injuries so severe as to require life flighting Cole O'Balle to a Houston hospital. (*Id*. at 74, 76-77.) On October 8, 2008, all officers involved in the H2o incident were ordered to supplement their initial reports with more detailed descriptions of that night. (Doc. No. 112-15, at 40.) Use of force forms were also ordered. (Doc. No. 112-11, at 75-76.)

Chief Wiley initiated an internal affairs investigation into the H2o incident. Among other things, investigator reviewed officers' compliance with departmental reporting directives. When internal affairs completed its investigation, eleven officers were disciplined for missing, late, or inaccurate reporting. (Doc. No. 112-11, at 82-83.) Three officers in leadership positions—Lt. Caldwell, Lt. Frankland, and Sgt. Mitchell—were also disciplined for failing to ensure accurate

and timely reports from their subordinates. (*Id*. at 83-84.) Seven officers accepted the discipline. (*Id*. at 83.) Four appealed: Lt. Frankland, Officer Coward, Officer Franco, and Officer Doucette. (*Id*. at 82-83.)

Chief Wiley separately tasked Lt. Caldwell with investigating the use of force during the H2o incident, despite the fact that Lt. Caldwell had himself used force that night. Lt. Caldwell's investigation revealed no inappropriate use of force, and no officer was reprimanded for his or her use of force during the H2o incident. (Doc. No. 119, at 1-15; Doc. No. 112-11, at 135.)

Chief Wiley acknowledges that deficient reporting can be motivated by a desire to avoid accountability for using force. (Doc. No. 112-11, at 107-08.) He also admits that poor reporting makes it difficult to investigate the propriety of a use of force. (*Id*. at 116.)

## II.    LEGAL STANDARDS

A motion for summary judgment requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. FED. R. CIV. P. 56(a). "Summary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Kee v. City of Rowlett, Tex.*, 247 F.3d 206, 210 (5th Cir. 2001) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). "A fact is material if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotations and footnote omitted).

"Facts and inferences reasonably drawn from those facts should be taken in the light most favorable to the non-moving party." *Nichols v. Enterasys Networks, Inc.*, 495 F.3d 185, 188 (5th Cir. 2007). The Court may not make credibility determinations or weigh the evidence. *Reeves v.*

*Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* at 151 (quoting 9A C. Wright & A. Miller, Federal Practice and Procedure § 2529, p. 300 (2d ed. 1995)). Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. FED. R. CIV. P. 56(e)(1); *see, e.g.*, *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (noting that a nonmovant's burden is "not satisfied with 'some metaphysical doubt as to the material facts'") (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

## III.    ANALYSIS

The City argues that it is entitled to summary judgment because Plaintiffs have failed to identify a policy or custom of the City of Galveston which caused Plaintiffs' injuries. (Doc. No. 112 ("Mot."), at 10.) Plaintiffs respond that they are pursuing municipal liability on the basis of two customs in place at the time of the H2o incident. (Doc. No. 118 ("Opp."), at 21-37.) These are: (1) a custom of using excessive force and (2) a custom of underreporting and underinvestigating acts of force. (*Id.*) Plaintiffs also claim that the City is liable for failure to train its officers. (*Id.* at 39-40.)

### A.      Overview of *Monell* Liability

Municipalities are considered "persons" subject to suit under Section 1983 for civil rights violations. *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). However, "a municipality cannot be held vicariously liable for the constitutional torts of its employees or

agents." *Gros v. City of Grand Prairie, Tex.*, 181 F.3d 613, 615 (5th Cir. 1999). This is because Section 1983 requires a showing that the defendant "subject[ed] or cause[d a plaintiff] to be subjected" to a deprivation of a federal right, *see* 42 U.S.C. § 1983, a requirement that "cannot be easily read to impose liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor." *Monell*, 436 U.S. at 692.

The Fifth Circuit has summarized the elements required for a *Monell* claim as "a policymaker; an official policy [or custom]; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citation omitted). These elements "exist to prevent a collapse of the municipal liability inquiry into a *respondeat superior* analysis." *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 167 (5th Cir. 2010).

Taking these elements out of turn, the first—identification of an official policy or custom—reflects that a municipality may be sued under Section 1983 only for its own acts. Accordingly, municipal liability may be pursued on the basis of "'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the local government entity's] officers.'" *Zarnow*, 614 F.3d at 166 (citation omitted). "Alternatively, municipal liability may attach where the constitutional deprivation is pursuant to a governmental custom, even if such custom has not received formal approval." *Id.*

The second element obligates the plaintiff to link the alleged policy or custom to the municipality through an approved "policymaker"—someone or something that "takes the place of the governing body in a designated area of city administration." *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984). Additionally, the policymaker's promulgation of policy or acquiescence to custom must demonstrate culpability for the plaintiff's resulting injury. If the

15

alleged custom or policy on its face "violate[s] federal law or authorize[s] the deprivation of federal rights," the culpability requirement is clearly met. Alternatively, a municipality can be culpable for a facially constitutional custom or policy if it was "adopted or maintained by the municipality's policymakers with deliberate indifference as to its known or obvious consequences," *O'Neal v. City of San Antonio*, 344 Fed. App'x 885, 888 (5th Cir. 2009), specifically the "risk that a violation of a particular constitutional or statutory right will follow." *Board of Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 411 (1997). "Deliberate indifference of this sort is a stringent test, and 'a showing of simple or even heightened negligence will not suffice' to prove municipal culpability." *Piotrowski*, 237 F.3d at 579 (quoting *Bryan Cnty.*, 520 U.S. at 407)).

Finally, the plaintiff must show that the policy or custom was causally linked to the constitutional violations at issue. "[T]here can be no municipal liability unless [an official policy or custom] is the moving force behind the constitutional violation." *James v. Harris Cnty.*, 577 F.3d 612, 617 (5th Cir. 2009).

**B.      The Chief of Police is the City of Galveston's designated policymaker in the relevant field.**

As noted above, a "policymaker" is an individual or entity that "takes the place of the governing body in a designated area of city administration." *Webster*, 735 F.2d at 841. A policymaker "decide[s] the goals for a particular city function and devise[s] the means of achieving those goals." *Bennett v. City of Slidell*, 728 F.2d 762, 769 (5th Cir. 1984). Whether an individual or entity is a "policymaker" for purposes of Section 1983 is question of state and local law. *See Valle v. City of Houston*, 613 F.3d 536, 542 (5th Cir. 2010). It is also highly dependent upon the specific facts regarding the municipality's organization and the particular area of city policy at issue in the case. "[T]he identification of those officials whose decisions represent the

official policy of the local governmental unit is itself a legal question to be resolved by the trial judge *before* the case is submitted to the jury." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989) (emphasis original).

Defendants argue that Galveston is a "home rule" city and that all policymaking authority resides, by virtue of Texas state law, in Galveston's City Council (the "City Council"). (Mot. at 6-8.) But the fact that Texas state law confers policymaking authority on the City Council does not answer the question of whether the City Council then delegated some of that authority to the Chief of the Galveston Police Department. *See Zarnow*, 614 F.3d at 167-68. Such delegation may be express or implied by "'conduct or practice.'" *Id.* at 167 (quoting *Bennett*, 728 F.2d at 769).

Plaintiffs do not argue that the City Council expressly delegated policymaking authority to the Chief of Police. Rather, Plaintiffs contend that the delegation is made evident by how Galveston Police Department policy is enacted. (Opp. at 18.) As testified to by Chief Wiley, and made apparent on the face of the documents themselves, Galveston Police Department policies and directives are authored by current and former Chiefs of Police. (Doc. No. 112-11, at 55-58; Doc. No. 112-4, at 16.) They are not reviewed by the City Manager or City Council before implementation. (Doc. No. 112-11, at 58; Doc. No. 112-10, at 21-22.) The Chief of Police himself or herself simply announces and rolls out the policy or directive through the chain of command. (Doc. No. 112-11, at 58; Doc. No. 112-10, at 22.) While the City Council or City Manager may possess some theoretical ability to overrule or constrain the policies enacted by the Chief of Police, it does not appear to have exercised such authority in recent memory. Specifically, there is no evidence that the City Council or City Manager reviewed, countermanded, or initiated *any* official policies in response to the H2o incident. By contrast,

Chief Wiley responded by launching an internal investigation to determine whether the officers involved properly executed under reporting directives put in place by former chiefs. (Doc. No. 112-11, at 82-83.) He also ordered additional training within the department on how to write adequate reports. (*Id.* at 51.) These actions indicate that Chief Wiley—as would be expected for a municipal policymaker—responded to a very significant incident involving municipal activity by "decid[ing] the goals for a particular city function"—i.e., transparent reporting of police activity—and "devis[ing] the means of achieving those goals." *Bennett*, 728 F.2d at 729.

The Fifth Circuit confronted this exact issue in *Zarnow v. City of Wichita Falls, Texas* and concluded, on the basis of very similar evidence, that "the chief of police is the sole official responsible for internal police policy" and that "[o]thers have only marginal involvement with the internal procedures of the police force." 614 F.3d at 168. This Court is similarly persuaded on the summary judgment record that the Chief of the Galveston Police Department is properly considered a policymaker for the City of Galveston in this case.

**C.    Plaintiffs have sufficient evidence to raise a fact issue as to whether their constitutional rights were violated pursuant to a pervasive custom within the Galveston Police Department of utilizing excessive force.**

Plaintiffs contend that, on the night of October 4, 2008, the Galveston Police Department operated pursuant to an unofficial custom of using excessive force. (Opp. at 36.) In support of the existence of this custom, Plaintiffs rely upon the events of the night itself. (*Id.* at 23-30.) Specifically, on October 4, in response to Officer Sanderson's request for assistance, at least thirty-four members of the Galveston Police Department responded to the San Luis hotel. (Doc. No. 119, at 11.) The police department at the time consisted of approximately 160 members

(Doc. No. 112-10, at 76), approximately half of which were on duty.[5] Of the thirty-four officers who responded, twenty are accused of engaging in or failing to prevent approximately forty-nine separate acts of excessive force against thirteen individuals.[6]

Defendants argue that many of these allegations are trumped up or flatly unbelievable. (Mot. at 19-20.) The Court cannot resolve such factual disputes on summary judgment. It must credit Plaintiffs' evidence and draw all reasonable inferences in Plaintiffs' favor. Consequently, for purposes of the City's Motion for Summary Judgment, the Court presumes that twenty Galveston officers—approximately 59% of the officers on scene, approximately 25% of the officers on duty, and approximately 13% of all officers in the department's employ—committed or failed to prevent acts of excessive force on the night of October 4, 2008.

Plaintiffs argue that the evidence of rampant and unreasonable uses of force that night is sufficient to establish that the police department was operating pursuant to an unofficial custom of using excessive force. (Opp. at 36.) The Court agrees. It is not possible to describe the exact quantum of evidence necessary to raise a fact issue on the existence of a municipal custom. As a general rule, however, a single example or episode is not sufficient. *See Bennett*, 728 F.2d at 768 n.3 ("Isolated violations are not the persistent, often repeated, constant violations that constitute custom and policy."). Some discernible pattern of similar behavior or activity is required. Specifically, in the context of an alleged governmental custom of using excessive force, "the 'plaintiff must demonstrate at least a pattern of similar incidents in which the citizens were

---

[5] At the time, due to the havoc created by Hurricane Ike, Galveston police officers were working seven days a week, on 12-hour shifts, with no days off. (Doc. No. 112-11, at 54.)

[6] The Court has reviewed the summary judgment record and constructed a chart of each alleged act of excessive force committed the night of October 4, 2008. This chart is attached to the Court's memorandum and order as Appendix A.

injured.'" *Cano v. Bexar Cnty., Tex.*, 280 Fed. App'x 404, 406 (5th Cir. 2008) (quoting *Estate of Davis ex rel. McCully v. City of North Richland Hills*, 406 F.3d 375, 383 (5th Cir. 2005)).

To make out a widespread municipal pattern or practice, a Section 1983 plaintiff must typically venture beyond the actions which caused his or her own alleged constitutional deprivation and introduce evidence of "similar" objectionable conduct by the same or other city employees. In the excessive force context, plaintiffs often rely upon prior complaints of excessive force within the relevant police department. *See, e.g., Cano*, 280 Fed. App'x at 406. Although a viable tactic in theory, it rarely proves successful in practice. Courts have criticized such evidence for lacking "context," *Peterson v. City of Fort Worth, Tex.*, 588 F.3d 838, 851 (5th Cir. 2009); for failing to show pervasiveness, *Cano*, 280 Fed. App'x at 406-07; for being temporally irrelevant, *Allen v. City of Galveston, Tex.*, Civil Action No. G-06-467, 2008 WL 905905, at *5 (S.D. Tex. Mar. 31, 2008); and for having little probative value because allegations of excessive force are not proof of excessive force, *James v. Harris Cnty.*, 508 F. Supp. 2d 535, 543 (S.D. Tex. 2007).

Given such a bleak track record, Plaintiffs appear to face a nearly insurmountable evidentiary hurdle. But this case presents a truly extreme factual scenario.  Here, the events of a single night provide, in essence, a self-contained case study on how and when numerous Galveston officers used force in the course of their discretionary duties. The H2o incident—while in some sense a single "episode"—is properly conceived of as a laboratory for evaluating how pervasively and recklessly constitutional norms were disregarded by a sizable portion of the Galveston police force. With thirteen alleged victims, twenty alleged perpetrators or accomplices, and forty-nine separate alleged acts of police brutality, Plaintiffs have identified a constellation of evidence from which a jury may divine a pattern. This is more than sufficient to

raise a fact issue on the existence of a custom or practice. *See Grandstaff v. City of Borger, Tex.*, 767 F.2d 161, 171 (5th Cir. 1985) (affirming jury verdict against municipality that employed officers who used excessive force because "[t]he evidence . . . prove[d] repeated acts of abuse on this night, by several officers in several episodes, tending to prove a disposition to disregard human life and safety so prevalent as to be police policy or custom").[7]

It is worth noting that the unique circumstances of this case permit Plaintiffs to avoid common evidentiary pitfalls in other custom and practice cases noted above. In this case, each Plaintiff's alleged constitutional violation serves as a potential "extraneous" bad act for his or her co-Plaintiffs. Temporal relevance is undeniable. So is the evidentiary weight to be afforded the alleged violation. After all, the same jury that will judge whether each alleged act was clearly excessive will also decide whether, in the aggregate, the Galveston officers exhibited an endemic and pervasive disregard for constitutional limitations on the use of force.

But *Monell* liability requires more than proof of a governmental custom or practice, even where the custom or practice on its face reveals a constitutional deficiency. The City's policymaker must be fairly charged with "actual or constructive knowledge" of the custom or practice. *See Valle*, 613 F.3d at 541. The relevant policymaker here, as discussed in Section III.B above, is the Chief of Police.

---

[7] The City argues that Plaintiffs cannot use *Grandstaff* as support for a ratification theory of municipal liability. (Doc. No. 126 ("Reply"), at 11-13.) The Court has expressed its own doubts that *Grandstaff* is properly construed as a ratification case, although multiple courts have used it in that manner. *See Hobart v. City of Stafford*, 916 F. Supp. 2d 783, 793-94 (S.D. Tex. 2013). However, the issue of whether *Grandstaff* supports the City's liability on the basis of ratification has not been raised here. As the Court reads Plaintiffs' opposition to the City's Motion, Plaintiffs rely upon *Grandstaff* for the proposition that a pre-existing custom or practice can be demonstrated through the events of a single night, when those events are as "extreme" as the events in *Grandstaff*. (Doc. No. 118 ("Opp."), at 37-38.) The Court agrees that this is a proper reading of *Grandstaff* and finds no difficulty applying its holdings to this case. *See Hobart*, 916 F. Supp. 2d at 793 (noting that language in the *Grandstaff* decision "suggests that liability . . . was premised on a finding of pre-existing city policy").

Plaintiffs have sufficient evidence to raise a fact issue as to the constructive or actual knowledge of the City's Chief of Police. Chief Wiley testified that—prior to his own hire—the Galveston Police Department had for decades promoted from within, drawing Chiefs from the leadership structures of the department itself. (Doc. No. 112-11, at 21.) There is evidence that any alleged custom in this case permeated the hierarchy from which these previous Chiefs were drawn. Indeed, one sergeant and two lieutenants, including the H2o "on-scene commander," are among those accused of using excessive force against Plaintiffs or failing to intervene as others used excessive force. *See* Appendix A.

But even if there were any doubt as to how high the custom or practice had infiltrated within the department, complaints about the department's use of force were well known to Galveston's City Manager and even to Chief Wiley upon his appointment, despite being hired as an "outsider." (Doc. No. 119-1, at 3; Doc. No. 112-10, at 53-54.) The local newspaper had been so critical of the department that all public relations had been cut off. (Doc. No. 112-11, at 30.) Even a member of the City Council invoked the department's well-known problems regarding force when he called for the institution of a Civilian Review Board. (Doc. No. 112-10, at 53-54.) In summary, Plaintiffs have identified sufficient evidence that the Chief of Police had actual or constructive knowledge that members of the Galveston police force were acting with a pervasive disregard for constitutional limitations on use of force.[8] *See Bennett*, 728 F.2d at 768

---

[8] The City seeks to exploit Chief Wiley's July 2008 appointment and the onset of Hurricane Ike to defeat any custom theory of liability, arguing that Chief Wiley "had precious little time to create any custom regarding use of force" prior to the H2o incident. (Doc. No. 112, at 11.) The Court disagrees with the proposition that, because Chief Wiley was in power at the time of the incident, he must have been "responsible" for any custom animating the officers' actions. Clearly, regardless of the switching out of the guard, endemic customs will persist from one policymaker to the next. Replacing the Chief of Police no more wiped out then-existing custom than it wiped out official policy. It is sufficient for Plaintiffs' theory of liability that the custom

("Constructive knowledge may be attributed to the governing body . . . where the violations were so persistent and widespread that they were the subject of prolonged public discussion or a high degree of publicity.").

> D.   **Plaintiffs are also entitled to have a jury decide whether their constitutional violations resulted from the police department's pervasive culture of underreporting and underinvestigating uses of force.**

Plaintiffs argue that, at the time of the H2o incident, the Galveston Police Department also operated pursuant to a custom of underreporting and underinvestigating uses of force. (Opp. at 31-37.) Plaintiffs have identified significant, compelling evidence of such a custom. They are entitled to a jury determination of this claim.

Chief Wiley concedes that the reporting of the H2o incident was uniformly deficient. (Doc. No. 112-11, at 45-46.) One of his primary complaints regarding the initial police reports was the widespread failure to report and justify acts of force. (*Id*. at 75-76.) Chief Wiley was so troubled by the state of the initial police reports that, on October 8, 2008, he specifically ordered the officers involved to supplement the file with more detailed descriptions. (Doc. No. 112-15, at 40.) He also initiated an internal investigation, which resulted in formal disciplinary action against eleven officers, including three officers in command positions—Sgt. Mitchell, Lt. Frankland, and the H2o on-scene commander, Lt. Caldwell—for poor reporting practices.  (Doc. No. 112-11, at 82-84.) Four of those officers appealed the disciplinary action on the theory that lax reporting was how the Galveston Police Department had always operated. (*Id*. at 82-83, 147.) They claimed it was unfair to punish them for acting in accordance with a longstanding and accepted practice. (*Id*. at 147.)

---

allegedly existed; that it was known to at least one policymaker but had not been eradicated; and that it was a moving force behind Plaintiffs' harm.

Chief Wiley also responded to the poor reporting of the H2o incident by ordering additional training on how to write adequate police reports. (Doc. No. 112-11, at 51.) Chief Wiley's decision to implement additional training is not legally sufficient evidence that the department's prior training was inadequate. *See City of Canton*, 489 U.S. at 391 (claim that harm could have been avoided if officer had "better or more training" insufficient because it "could be made about almost any encounter resulting in injury"). However, it is some evidence that, despite a written directive requiring officers to report use of force (Doc. No. 112-8, at 15), the Galveston Police Department on October 4, 2008 was failing to live up to that directive in practice. As explained by Chief Wiley, he was not instituting new policies—he was simply enforcing policies that already existed. (Doc. No. 112-11, at 46.)

In addition to the above evidence, the existence of a deficient reporting culture is amply supported by the initial H2o reports themselves. The Court has reviewed the contents of the police file on the H2o incident and has constructed a chart containing all known alleged acts of force from that night. The Court's chart is attached to the end of this memorandum and order as Appendix A. By the Court's calculations—which the Court admits is subject to interpretation and manipulation—officers are accused of committing at least forty-nine distinct acts of force on October 4, 2008. Thirty-six acts were not reported by the officers who allegedly engaged in them, indicating a self-reporting rate of only 27%.[9] More telling, forty-three acts were not reported by other officers, despite the fact that all of the acts occurred in public spaces with multiple fellow officers around. This indicates a cross-reporting rate of only 12%.

---

[9] For purposes of the reporting rates included in the Court's analysis, the Court takes into account only the police reports drafted prior to October 8, 2008, when Chief Wiley specifically ordered more detailed supplementation from the officers involved. (Doc. No. 112-15, at 40.) The Court acknowledges that the supplemental police reports unearthed additional acts of force not initially reported. Such delayed reporting is reflected in Appendix A, below.

These potential reporting rates are compelling in themselves.[10] Equally compelling, however, is how deficient reporting obscured the use of force against particular individuals. Specifically, relying upon the initial police reports alone, there would be little to no indication that the following individuals were subjected to *any* force:

- **Calvin Silva.** As described above, Mr. Silva was struck with a flashlight and then a baton, thrown to the ground, pepper sprayed, and pummeled all over his body. But the arresting officer in his case, Officer Michael, wrote in his initial report that Mr. Silva "aggressively approach[ed]" him and "ignored [his] commands to stay back." (Doc. No. 112-14, at 6.) Officer Michael continued that "[d]ue to the fact that Silva consistently ignored my commands to stay back and to not interfere he was arrested for Interfering with a Police Officer." (*Id.*) No more was said about Mr. Silva's arrest. From the original report, it would appear that not a single hand was laid upon Mr. Silva. Officer Michael maintained this position during the internal affairs investigation as well, telling investigators that he took Mr. Silva into custody "without incident." (Doc. No. 112-16, at 14.) It wasn't until his deposition that Officer Michael finally admitted to seeing other officers push Mr. Silva, take him to the ground, and pepper spray him. (Doc. No. 113-1, at 35-36.)

- **Aaron Trevino.** As described above, Mr. Trevino was hit with Lt. Frankland's baton from behind; fell to the ground; was hit by the baton twice more; and was pepper sprayed in the face by Officer Balli. These acts of force were committed in view of Sgt. Mitchell and possibly Officer Longoria. But the baton strikes did not appear in any of these four officers' initial reports. (Doc. No. 112-15, at 30; Doc. No. 112-15, at 16-18; Doc. No. 112-13, at 44-45.) Instead, Lt. Frankland described that Mr. Trevino "went to the ground as asked." (Doc. No. 112-15, at 30.) As for the pepper spray used by Officer Balli, the only officer who even alludes to pepper spray in Mr. Trevino's case is Lt. Frankland, who opaquely suggests that Mr. Trevino was complaining of being victim to overspray—while simultaneously disclaiming knowledge of what he meant. (Doc. No. 112-15, at 29-30.) Notably, although Mr. Trevino was directly involved in the circumstances of Gil O'Balle's arrest, only Lt. Frankland acknowledged Mr. Trevino's presence in his report.

- **Justin Packard.** As described above, Mr. Packard was thrown to the ground and pepper sprayed. But the report of the arresting officer—Officer Rutherford— states only that "[d]ue to Packard's inability to listen to simple commands and above actions he was arrested." (Doc. No. 112-14, at 1.) Officer Rutherford's

---

[10] Over half of the alleged acts of excessive force are denied by Defendants. Assuming that the jury credits Defendants, and finds that these disputed acts never occurred, the self-reporting rate for undisputed acts of force is only 54%. The cross-reporting rate for undisputed acts of force is even lower, at 25%.

write-up of the arrest is identical to Officer R. Sanderson's write-up of the arrest of Mr. Guidry, indicating that the "report" was nothing more than a simple cut-and-paste job. (*Id*.; Doc. No. 112-13, at 41.) It wasn't until Officer Rutherford was interviewed by internal affairs in late October 2008 that he admitted using "minimal force" in Mr. Packard's arrest. (Doc. No. 112-16, at 5.) But he still failed to explain what he meant by "minimal force."

- **Charles Young.** As described above, Mr. Young was thoroughly worked over by at least five different officers on the night in question. But the original report of the arresting officer—Officer Tovar—made absolutely no mention of any force at all. (Doc. No. 112-15, at 15.) During a later internal affairs investigation, Officer Tovar admitted to using "closed hand strikes" on Mr. Young. (Doc. No. 112-16, at 3.) He continued to offer no real justification for the force, however.

Finally, an alleged custom of underreporting and underinvestigating use of force is also supported by the department's half-hearted compliance with formal procedures for reporting and reviewing uses of force after the H2o incident. As Chief Wiley testified, no use of force forms were generated in the immediate aftermath of the incident, despite the fact that force was clearly exercised on the night in question. (Doc. No. 112-11, at 74, 76-77.) After Chief Wiley and internal affairs demanded a more complete accounting from the officers involved, three use of force forms were generated. But these forms covered only six acts of force employed by six officers—a mere 12% of the force employed that night. (Doc. No. 112-18, at 30-35.) Some of the most significant and undisputed acts of force are conspicuously absent from the forms, such as: Officer Garcia's use of closed hand strikes against Cole; Officer Sanderson's use of baton strikes and closed hand strikes against Cole; Officer Sanderson's use of O.C. spray against the Belluominis; and Officer Longoria's use of a taser against Cole O'Balle and Gil O'Balle. These three use of force forms—along with Lt. Caldwell's narrative summary of the force employed during the H2o incident—appear to constitute the entirety of the department's "investigation" regarding its officers' use of force on October 4, 2008. Chief Wiley acknowledged that the deficient reporting made it difficult to "tell what happened" that night and impeded the

department's investigation into use of force. (Doc. No. 119-4, at 5-6.) Not surprisingly, no Galveston officer was reprimanded for his or her use of force during the H2o incident. (Doc. No. 112-11, at 134-35.)

The above evidence is more than enough to show a fact issue as to whether, on October 4, 2008, Galveston officers underreported and underreviewed uses of force as a matter of course, despite written police directives to the contrary. It is not enough for Plaintiffs to establish that the custom existed, however. They must also have some evidence that the custom was known to the City's policymaker, and that the policymaker allowed it to continue with "deliberate indifference" to its known or obvious constitutional ramifications. *See Bryan Cnty.*, 520 U.S. at 411. In other words, this theory of liability can survive summary judgment only if Plaintiffs identify some evidence that the Chief of Police was aware that officers' uses of forces were serially underreported and underinvestigated and allowed the practice to continue despite a "known or obvious consequence" that excessive use of force is likely to follow. *See id.* at 410.

Plaintiffs have evidence of awareness of the alleged custom. First, Chief Wiley testified that, when he took over the department in July 2008, there was a "lack of reporting"—including force reporting—department-wide. (Doc. No. 112-11, at 43-44.) Moreover, as with the prior alleged custom of using excessive force, the entrenchment of the alleged custom through the ranks of the department is supported by the fact that Sgt. Mitchell, Lt. Frankland, and Lt. Caldwell—the ranking officers on scene during the H2o incident—themselves generated deficient reporting and failed to report acts of force. (*Id.* at 82-83.) Prior to hiring Chief Wiley, the City routinely promoted Chiefs from within the department. (*Id.* at 21.) This supports an inference that Chief Wiley's immediate predecessors also had actual or constructive knowledge of the pervasive culture of deficient force reporting and review.

Plaintiffs have not identified any particular evidence that would support deliberate indifference on the part of Chief Wiley's predecessors, however. It may be that the constitutional ramifications of operating a police force which routinely underreports and underinvestigates its own uses of force are so "plainly obvious" that no additional evidence is necessary. *See Bryan Cnty.*, 520 U.S. at 411. But the Court need not reach this question. Plaintiffs have evidence that Chief Wiley himself was cognizant that deficient reporting on and review of uses of force can facilitate, mask, and even encourage the use of excessive force. (Opp. at 31-33.)

In the case of Chief Wiley, the term "deliberate indifference" is a bit of a misnomer. His apparent attempts to rectify the deep, endemic problems within the Galveston Police Department are commendable and hardly "indifferent." Nonetheless, as the Court reads case law regarding the culpability requirement for *Monell* liability, the "deliberate indifference" standard is meant to require some element of actual knowledge regarding the risks of a facially constitutional policy or custom. *See Piotrowski*, 237 F.3d at 579 (clarifying that municipal culpability is not demonstrated by "simple or even heightened negligence") (quotation marks and citation omitted). As he made clear in his deposition, Chief Wiley was very aware of the constitutional implications for use of force in a law enforcement agency that lacked robust reporting:

> The – the reporting officer's activity is critical and can't be overstated, especially as it relates to use of force, especially in Galveston, Texas, given the history here. And so, it was significant that so many folks didn't properly and adequately report. And I said before, I'll say it again. I don't necessarily think that they intentionally did that. I think that, more than anything else, it was a matter of the culture that evolved over time and it was a matter of, "Oh well, if I don't do it, they can't ask me about it. If I don't file a report, then I won't have to explain my actions," those kinds of things.

(Doc. No. 119-3, at 3.)

The Court accepts that Chief Wiley may have sincerely intended, even before the H2o incident, to improve departmental compliance with existing reporting requirements. But this had not occurred as of the night of October 4, 2008. And Plaintiffs rightly point out that they were entitled to their Fourth Amendment protections, regardless of Chief Wiley's good intentions and an intervening natural disaster which delayed his attempts at reformation. (Opp. at 39.)

Finally, the Court finds that the evidence described above presents a fact issue as to whether the department's alleged custom of underreporting acts of force was a "moving force" behind Plaintiffs' constitutional violations. *See James*, 577 F.3d at 617. In summary, Plaintiffs are entitled to jury determination of this theory of *Monell* liability.

### E.    The City is entitled to summary judgment on Plaintiffs' failure-to-train claim.

Finally, Plaintiffs argue that the City failed to train its police officers to properly use force. (Opp. at 44-45.) In a Section 1983 claim for failure to train, the issue "is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent 'city policy.'"  *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).  The Supreme Court explained:

> It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.  In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Id*. (footnote omitted).  For example, the need to train officers about the constitutional limitations on the use of deadly force is obvious if the city arms its officers with firearms.  *Id*. at 390 n.10.

The Fifth Circuit has laid out three clear requirements for any failure to train claim: "(1) the municipality's training policy or procedure was inadequate; (2) the inadequate training policy was a 'moving force' in causing violation of the plaintiff's rights; and (3) the municipality was deliberately indifferent in adopting its training policy." *Valle*, 613 F.3d at 544; *see also Goodman v. Harris Cnty.*, 571 F.3d 388, 395 (5th Cir. 2009).

Plaintiffs generally allege a lack of training to properly use force. (Opp. at 44.) However, Plaintiffs do not provide evidence of any particular deficiencies in the officers' training. Instead, Plaintiffs argue simply that the inadequacy of the officers' training is manifested through their allegedly unconstitutional behavior. (*Id*. at 45.)

To succeed on a failure to train claim, "a plaintiff must allege with specificity how a particular training program is defective." *Roberts v. City of Shreveport*, 397 F.3d 287, 293 (5th Cir. 2005). Plaintiffs fail to identify any specific deficiencies regarding Galveston officers' training. (Opp. at 44-45.) Vague assertions regarding the need for "better or more training" is insufficient for a constitutional failure to train claim. *See City of Canton*, 489 U.S. at 391. "Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal." *Id*.

The only summary judgment evidence directly related to the officers' training is the City's evidence that all officers were trained in accordance with standards adopted by the state of Texas through the Texas Commission on Law Enforcement Standards and Education ("TCLEOSE"). (Mot. at 24.) Although not dispositive, compliance with state requirements is "a factor counseling against a 'failure to train' finding." *Zarnow*, 614 F.3d at 171 (5th Cir. 2010); *see also Hobart v. City of Stafford*, 784 F. Supp. 2d 732, 754 (S.D. Tex. 2011). Because

Plaintiffs have not specifically identified how the officers' training regimen was lacking, or provided sufficient evidence in support, the City is entitled to summary judgment on this claim.

## IV.     CONCLUSION

For the reasons stated above, the City of Galveston's Motion for Summary Judgment (Doc. No. 112) is **DENIED** as to Plaintiffs' claim that they were injured pursuant to a municipal custom of using excessive form and **DENIED** as to Plaintiffs' claim that they were injured pursuant to a municipal custom of underreporting uses of force. The Motion is **GRANTED** as to Plaintiffs' claim that the City of Galveston failed to adequately train its officers to properly use force.

**IT IS SO ORDERED**.

**SIGNED** this the fifth day of March, 2014.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

**Appendix 1: Reporting on Uses of Force during the H2o Incident**[11]

|   | Officer | Suspect | Type of force | Disputed | Self-reported? | Reported by others? | Use of force form? |
|---|---------|---------|---------------|----------|----------------|---------------------|--------------------|
| 1 | Garcia | C. O'Balle | Closed hand strikes: pre-tasing | No | Yes | No[12] | No |
| 2 | C. Sanderson | C. O'Balle | Baton strikes: pre-tasing | No | Yes | Yes and No[13] | No |
| 3 | C. Sanderson | J. Belluomini | O.C. spray | No | Yes | Yes and No[14] | No |
| 4 | Unknown | C. O'Balle | O.C. spray | No[15] | No | No | No |

[11] In constructing Appendix 1, the Court was mindful of Galveston Police Department Rules and Regulations, specifically part 11 of RR – 001:

> 11. Reporting the use of Force
>
> Any officer who discharges a weapon, applies force (other than physical strength or skill) or causes any injury to a suspect or other person must immediately notify an on-duty supervisor and file the appropriate report with the Office of the Chief of Police as soon as practical.

(Doc. No. 112-8, at 15.) In light of this directive, the Court has not included in Appendix 1 any uses of force which may be characterized as mere application of "physical strength or skill," such as pushing.

[12] Omitted from Officer Sanderson's October 5th report (Doc. No. 112-13, at 34-35); Officer Longoria's October 5th supplement (Doc. No. 112-13, at 44-45); and Officer Goode's October 5th report and October 10th supplement (Doc. No. 112-15, at 46-47). Both Officer Goode and Officer Longoria now admit that they saw Officer Garcia use closed hand strikes on Cole O'Balle. (Doc. No. 112-16, at 7-8; Doc. No. 112-20, at 61-62.)

[13] Reported by Officer Garcia (Doc. No. 112-13, at 42) and Officer Longoria (*id*., at 44). Omitted by Officer Goode. (Doc. No. 112-15, at 46-47.)

[14] Reported by Officer Garcia (Doc. No 112-13, at 42) and alluded to in Officer Goode's October 10th supplement (Doc. No. 112-15, at 47). Omitted from Officer Goode's October 5th report (Doc. No. 112-15, at 46) and Officer Longoria's October 5th supplement (Doc. No. 112-13, at 44).

| | Officer | Suspect | Type of force | Disputed | Self-reported? | Reported by others? | Use of force form? |
|---|---|---|---|---|---|---|---|
| 5 | Longoria | C. O'Balle | Taser | No | Yes | Yes and No[16] | No |
| 6 | C. Sanderson | C. O'Balle | Baton strikes: post-tasing | No[17] | No | Yes and No[18] | No |
| 7 | Unknown | C. O'Balle | Closed hand strikes: post-tasing | Yes[19] | No | No | No |
| 8 | Unknown | C. O'Balle | Kicks: post-tasing | Yes[20] | No | No | No |
| 9 | Unknown | S. Belluomini | Lifted by hair | Yes[21] | No | No | No |
| 10 | C. Sanderson | S. Belluomini | O.C. spray | No | Yes | Yes and No[22] | No |

---

[15] Observed by Michael Patterson (Doc. No. 112-17, at 27) and confirmed by Officer Garcia in December 2008 interview, although he does not identify the officer responsible. (Doc. No. 112-16, at 13.)

[16] Reported by Officer Sanderson (Doc. No. 112-13, at 35) and Officer Garcia (*id.*, at 42). Omitted by Officer Goode in October 5th report (Doc. No. 112-15, at 46), but included in October 10th supplement (*id.* at 47).

[17] Reported by Officer Goode in October 10th supplement (Doc. No. 112-15, at 47) and confirmed by Officer Goode in October and November 2008 interviews (Doc. No. 112-16, at 4, 8).

[18] Reported by Officer Goode in October 10th supplement (Doc. No. 112-15, at 47) and confirmed by Officer Goode in October and November 2008 interviews (Doc. No. 112-16, at 4, 8). Omitted by Officer Goode in October 5th report (Doc. No. 112-15, at 46) and by Officer Longoria in October 5th supplement (Doc. No. 112-13, at 44).

[19] Observed by Calvin Silva (Doc. No. 113-9, at 64) and Aaron Trevino (Doc. No. 113-20, at 13, 16).

[20] Observed by Calvin Silva (Doc. No. 113-19, at 64).

[21] Reported by Mrs. Belluomini (Doc. No. 117-19, at 20).

[22] Reported by Officer Garcia in October 5th report (Doc. No. 112-13, at 42) and alluded to in Officer Goode's October 10th supplement (Doc. No. 112-15, at 47). Omitted from Officer

|    | Officer | Suspect | Type of force | Disputed | Self-reported? | Reported by others? | Use of force form? |
|----|---------|---------|---------------|----------|----------------|---------------------|--------------------|
| 11 | McDermott | Backe | Thrown into wall | No | Yes | Yes, delayed[23] | No |
| 12 | McDermott, Doucette | Backe | Thrown to ground | No | Yes[24] | Yes | No |
| 13 | Unknown | Backe | Knee strike to upper back | Yes[25] | No | No | No |
| 14 | McDermott | Backe | Closed hand strikes | No | Yes | Yes, delayed, and No[26] | No |
| 15 | Doucette | Backe | Closed hand strikes | No | Yes, delayed[27] | No | Yes |
| 16 | Franco | Backe | Closed hand strikes | No | Yes, delayed[28] | Yes, delayed, and No[29] | Yes |

Goode's October 5th report (Doc. No. 112-15, at 46) and Officer Longoria's October 5th supplement (Doc. No. 112-13, at 44).

[23] Reported in Officer Doucette's October 8th supplement. (Doc. No. 112-15, at 23.) On October 8, 2008, all officers involved in the H2o incident were ordered to supplement their initial reports. (*Id.*, at 40.)

[24] Doucette's reporting of this force was delayed. (Doc. No. 112-15, at 23.)

[25] Reported by Mr. Backe (Doc. No. 113-10, at 4-5) and observed by Chris Lankford (Doc. No. 112-17, at 28) and Danny Higgins (*id.* at 32).

[26] Reported by Officer Doucette in October 8th supplement. (Doc. No. 112-15, at 23.) On October 8, 2008, all officers involved in the H2o incident were ordered to supplement their initial reports. (*Id.*, at 40.) Omitted from Officer Garcia's October 5th report (Doc. No. 112-13, at 42-43) and Officer Franco's October 8th supplement (Doc. No. 112-15, at 39). In a December 2008 interview, Officer Garcia acknowledged seeing Officer McDermott and Officer Franco struggling with Mr. Backe. (Doc. No. 112-16, at 13.)

[27] Reported in October 8th supplement. (Doc. No. 112-15, at 23.) On October 8, 2008, all officers involved in the H2o incident were ordered to supplement their initial reports. (*Id.*, at 40.)

[28] Reported in October 8th supplement. (Doc. No. 112-15, at 39.) On October 8, 2008, all officers involved in the H2o incident were ordered to supplement their initial reports. (*Id.*, at 40.)

[29] Reported by Officer Doucette in October 8th supplement. (Doc. No. 112-15, at 23.) On October 8, 2008, all officers involved in the H2o incident were ordered to supplement their

|    | Officer | Suspect | Type of force | Disputed | Self-reported? | Reported by others? | Use of force form? |
|----|---------|---------|---------------|----------|----------------|---------------------|--------------------|
| 17 | Unknown | Backe | Kick | Yes[30] | No | No | No |
| 18 | Coward | Silva | Flashlight strike | No | Yes, delayed[31] | No | Yes |
| 19 | Unknown | Silva | Baton strike | Yes[32] | No | No | No |
| 20 | Unknown | Silva | Thrown to ground | No[33] | No | No | No |
| 21 | Unknown | Silva | O.C. spray | No[34] | No | No | No |
| 22 | Unknown | Silva | Body strikes | Yes[35] | No | No | No |
| 23 | Longoria | G. O'Balle | Taser | No | Yes | Yes | No |
| 24 | Balli | G. O'Balle | O.C. spray | No | Yes | No[36] | Yes |
| 25 | Unknown | G. O'Balle | Kick | Yes[37] | No | No | No |

initial reports. (*Id.*, at 40.) Omitted from Officer Garcia's October 5th report (Doc. No. 112-13, at 42-43) and Officer McDermott's October 5th report (Doc. No. 112-14, at 3-4). In a December 2008 interview, Officer Garcia acknowledged seeing Officer McDermott and Officer Franco struggling with Mr. Backe. (Doc. No. 112-16, at 13.)

[30] Reported by Mr. Backe (Doc. No. 113-10, at 5) and observed by Michael McMillan (Doc. No. 112-17, at 34), Blair Patterson (*id.* at 26), and Danny Higgins (*id.* at 32).

[31] Reported in October 12th supplement, but omitted the use of a flashlight. (Doc. No. 112-15, at 50.) On October 8, 2008, all officers involved in the H2o incident were ordered to supplement their initial reports. (*Id.*, at 40.) In October 21, 2008 interview, Officer Coward admitted that he used a flashlight to strike Mr. Silva. (Doc. No. 112-16, at 2.)

[32] Reported by Mr. Silva. (Doc. No. 113-19, at 67.)

[33] Officer Michael admitted in his June 2013 deposition that he saw Mr. Silva "hip tossed" to the ground by another officer. (Doc. No. 113-1, at 35-36.)

[34] Officer Michael admitted in his June 2013 deposition that he saw Mr. Silva pepper sprayed by a DEA agent. (Doc. No. 113-1, at 33.)

[35] Reported by Mr. Silva. (Doc. No. 113-19, at 71-72.)

[36] Alluded to in Lt. Frankland's October 6th report, but Lt. Frankland disclaimed personal knowledge (Doc. No. 112-15, at 29-30). Omitted from Officer Longoria's October 5th supplement (Doc. No. 112-13, at 44) and Sgt. Mitchell's October 5th supplement (Doc. No. 112-15, at 16-17). In November 2008 interview, Lt. Frankland admitted that O.C. spray was used on Gil O'Balle. (Doc. No. 112-16, at 10.)

|    | Officer  | Suspect    | Type of force            | Disputed         | Self-reported?      | Reported by others?            | Use of force form? |
|----|----------|------------|--------------------------|------------------|---------------------|--------------------------------|--------------------|
| 26 | Unknown  | G. O'Balle | Pressed face into pavement | Yes[38]        | No                  | No                             | No                 |
| 27 | Balli    | Trevino    | O.C. spray               | Yes and No[39]   | No                  | No                             | No                 |
| 28 | Unknown  | Trevino    | Baton strikes            | Yes[40]          | No                  | No                             | No                 |
| 29 | Frankland | G. O'Balle | Dragged over concrete   | No[41]           | No                  | No                             | No                 |
| 30 | Burus    | McMillan   | Thrown on car            | Yes[42]          | No                  | No                             | No                 |
| 31 | Burus    | McMillan   | Thrown to ground         | Yes[43]          | No                  | No                             | No                 |
| 32 | Benham   | Goodson    | Thrown to ground         | No               | Yes, delayed[44]    | Yes, delayed, and No[45]       | No                 |

[37] Reported by Gil O'Balle. (Doc. No. 113-17, at 103.)

[38] Reported by Gil O'Balle. (Doc. No. 113-17, at 100-01.)

[39] Numerous officers acknowledge that Mr. Trevino was pepper sprayed that night. (Doc. No. 112-15, at 29-30, 40, 43.) No one admits to seeing it happen or identifies the officer involved.

[40] Reported by Mr. Trevino. (Doc. No. 113-20, at 21, 31.)

[41] Confirmed by Lt. Frankland in his April 2013 deposition. (Doc. No. 113-2, at 120-21.)

[42] Reported by Mr. McMillan. (Doc. No. 113-5, at 62.) In October 2008, Officer Burus denied using any force in Mr. McMillan's arrest. (Doc. No. 112-16, at 2.)

[43] Reported by Mr. McMillan. (Doc. No. 113-15, at 34.) In October 2008, Officer Burus denied using any force in Mr. McMillan's arrest. (Doc. No. 112-16, at 2.)

[44] Omitted from October 5th supplement (Doc. No. 112-13, at 39). Reported in October 8th supplement. (Doc. No. 112-15, at 32.) On October 8, 2008, all officers involved in the H2o incident were ordered to supplement their initial reports. (*Id.*, at 40.)

[45] Reported in Officer Doucette's October 8th supplement (Doc. No. 112-15, at 24) and Officer Goode's October 10th supplement (*id.* at 48). On October 8, 2008, all officers involved in the H2o incident were ordered to supplement their initial reports. (*Id.*, at 40.) Omitted from Officer Goode's October 5th report (Doc. No. 112-15, at 46); Officer Camune's October 8th supplement

| | Officer | Suspect | Type of force | Disputed | Self-reported? | Reported by others? | Use of force form? |
|---|---|---|---|---|---|---|---|
| 33 | Unknown | Goodson | Kneed in the side | Yes[46] | No | No | No |
| 34 | Unknown | Goodson | Kick | Yes[47] | No | No | No |
| 35 | Caldwell | Goodson | O.C. spray | No | Yes, delayed[48] | Yes, delayed, and No[49] | Yes |
| 36 | Simpson | Cornwell | Thrown to ground | Yes[50] | No | No | No |
| 37 | Simpson | Cornwell | Pressed face into ground | Yes[51] | No | No | No |
| 38 | Unknown | Packard | Thrown to ground | Yes[52] | No | No | No |
| 39 | Unknown | Packard | O.C. spray | Yes[53] | No | No | No |

(*id.* at 27-28); Lt. Caldwell's October 5th supplement (Doc. No. 112-13, at 39); and Lt. Caldwell's October 8th supplement (Doc. No. 112-15, at 32).

[46] Reported by Mr. Goodson. (Doc. No. 117-23, at 6.)

[47] Reported by Mr. Goodson. (Doc. No. 117-23, at 6.)

[48] Reported in October 8th supplement. (Doc. No. 112-15, at 35.) On October 8, 2008, all officers involved in the H2o incident were ordered to supplement their initial reports. (*Id.*, at 40.)

[49] Reported in Officer Doucette's October 8th supplement (Doc. No. 112-15, at 24) and in Officer Benham's October 8th supplement (*id.* at 36). Omitted from Officer Camune's October 8th supplement (*id.* at 27-28) and Officer Goode's October 5th report and October 10th supplement (*id.* at 46-48).

[50] Reported by Mr. Cornwell. (Doc. No. 113-14, at 36.) In October 2008 interview, Officer Simpson stated that no force was used in Mr. Cornwell's arrest. (Doc. No. 112-16, at 4.)

[51] Reported by Mr. Cornwell. (Doc. No. 113-14, at 37, 42.) In October 2008 interview, Officer Simpson stated that no force was used in Mr. Cornwell's arrest. (Doc. No. 112-16, at 4.)

[52] Reported by Mr. Packard. (Doc. No. 113-18, at 34-35.) In October 2008 interview, Officer Rutherford said that "minimal force" was used in arresting Mr. Packard. (Doc. No. 112-16, at 5.) In his June 2013 deposition, Officer Rutherford said that Mr. Packard was on the ground when Officer Rutherford reached him. (Doc. No. 112-21, at 65.)

[53] Reported by Mr. Packard. (Doc. No. 113-18, at 34-35.) In October 23, 2008 interview, Officer Rutherford said that "minimal force" was used in arresting Mr. Packard. (Doc. No. 112-16, at 5.)

|  | Officer | Suspect | Type of force | Disputed | Self-reported? | Reported by others? | Use of force form? |
|---|---|---|---|---|---|---|---|
| 40 | R. Sanderson and/or Rutherford | Guidry | O.C. spray | Yes and No[54] | No | No | No |
| 41 | Tovar, Dooley, Mims Manuell | Young | Thrown to ground | No | Yes and No[55] | No | No |
| 42 | Tovar, Dooley, and/or Mims Manuell | Young | Body strikes: 1st beating | No | Yes and No[56] | No | No |
| 43 | Mims Manuell | Young | Kick to face | Yes[57] | No[58] | No[59] | No |
| 44 | Frankland | Young | Kick to ribs | Yes[60] | Yes | No[61] | Yes |

---

[54] In October 23, 2008 interview, Officer R. Sanderson claimed that Mr. Guidry had been pepper sprayed before Officer R. Sanderson came in contact with him. (Doc. No. 112-17, at 2.) Mr. Guidry and Mr. Packard claim that Mr. Guidry was pepper sprayed after he arrived at the jail, by either Officer R. Sanderson or Officer Rutherford. (Doc. No. 113-18, at 41-42; Doc. No. 112-17, at 25.)

[55] Reported in Officer Mims Manuell's and Officer Dooley's joint October 5th supplement (Doc. No. 112-15, at 38) but omitted from Officer Mims Manuell's October 5th report (Doc. No. 112-14, at 10) and Officer Tovar's October 5th supplement (Doc. No. 112-15, at 15).

[56] Omitted from Officer Tovar's October 5th supplement (Doc. No. 112-15, at 15) and Officer Mims Manuell's October 5th report (Doc. No. 112-14, at 10). Alluded to in Officer Mims Manuell's and Officer Dooley's joint October 5th supplement (i.e., a struggle ensued). (Doc. No. 112-15, at 38.) In an October 2008 interview, Officer Tovar admitted that he used closed hand strikes to take Mr. Young into custody. (Doc. No. 112-16, at 3.)

[57] Reported by Mr. Young. (Doc. No. 113-21, at 59.)

[58] Officer Mims Manuell and Officer Dooley alluded to a struggle with Mr. Young in their joint October 5th supplement but did not report specific acts of force. (Doc. No. 112-15, at 38.)

[59] Sgt. Mitchell alluded to a struggle with Mr. Young but identified only the officers involved, not the specific acts of force observed. (Doc. No. 112-15, at 16-17.)

| | Officer | Suspect | Type of force | Disputed | Self-reported? | Reported by others? | Use of force form? |
|---|---|---|---|---|---|---|---|
| 45 | Dooley, Mims Manuell, and/or Frankland | Young | "Dog piled" | Yes[62] | No[63] | No[64] | No |
| 46 | Frankland | Young | Kneed in back | No | Yes | No[65] | No |
| 47 | Dooley, Mims Manuell, and/or Frankland | Young | Stepped on neck | Yes[66] | No | No[67] | No |

---

[60] Reported in Lt. Frankland's October 6th report (Doc. No. 112-15, at 30) but disputed by Mr. Young. Mr. Young claims that Officer Mims Manuell's kick to the face is what caused him to fall back onto the ground. (Doc. No. 113-21, at 61.)

[61] Sgt. Mitchell alluded to a struggle with Mr. Young but identified only the officers involved, not the specific acts of force observed. (Doc. No. 112-15, at 16-17.) Officer Mims Manuell and Officer Dooley likewise alluded to a struggle with Mr. Young in their joint October 5th supplement but did not report specific acts of force. (Doc. No. 112-15, at 38.)

[62] Reported by Mr. Young. (Doc. No. 113-21, at 61.)

[63] Officer Mims Manuell and Officer Dooley alluded to a struggle with Mr. Young in their joint October 5th supplement but did not report specific acts of force. (Doc. No. 112-15, at 38.)

[64] Sgt. Mitchell alluded to a struggle with Mr. Young but identified only the officers involved, not the specific acts of force observed. (Doc. No. 112-15, at 16-17.)

[65] Sgt. Mitchell alluded to a struggle with Mr. Young but identified only the officers involved, not the specific acts of force observed. (Doc. No. 112-15, at 16-17.) Officer Mims Manuell and Officer Dooley likewise alluded to a struggle with Mr. Young in their joint October 5th supplement but did not report specific acts of force. (Doc. No. 112-15, at 38.)

[66] Reported by Mr. Young. (Doc. No. 113-21, at 61-62.)

[67] Sgt. Mitchell alluded to a struggle with Mr. Young but identified only the officers involved, not the specific acts of force observed. (Doc. No. 112-15, at 16-17.) Officer Mims Manuell and Officer Dooley likewise alluded to a struggle with Mr. Young in their joint October 5th supplement but did not report specific acts of force. (Doc. No. 112-15, at 38.)

| | Officer | Suspect | Type of force | Disputed | Self-reported? | Reported by others? | Use of force form? |
|---|---|---|---|---|---|---|---|
| 48 | Dooley, Mims Manuell, and/or Frankland | Young | Body strikes: 2nd beating | Yes[68] | No[69] | No[70] | No |
| 49 | Unknown | Young | Taser | Yes[71] | No | No | No |

---

[68] Reported by Mr. Young. (Doc. No. 113-21, at 61-62.)

[69] Officer Mims Manuell and Officer Dooley alluded to a struggle with Mr. Young in their joint October 5th supplement but did not report specific acts of force. (Doc. No. 112-15, at 38.)

[70] Sgt. Mitchell alluded to a struggle with Mr. Young but identified only the officers involved, not the specific acts of force observed. (Doc. No. 112-15, at 16-17.)

[71] Reported by Mr. Young. (Doc. No. 113-21, at 61-63.)